[Crim. No. 19683. Second Dist., Div. One. Aug. 9, 1971.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSEPH FRANK STAY, Defendant and Appellant.

**168**

## COUNSEL

Joseph Frank Stay, in pro. per., and Earl J. Opsahl for Defendant and Appellant.

Evelle J. Younger, Attorney General, William E. James, Assistant Attorney General, and Joel S. Moskowitz, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**LILLIE, J.**—The cause having been submitted on the transcript of the testimony taken at the preliminary hearing and the court having heard additional prosecution and defense witnesses, defendant was found guilty on five counts of grand theft (§ 487, subd. 1, Pen. Code) of shopping carts over a period between February 1, 1969, and February 1, 1970, from Ralph's Grocery Company (count I), Lucky Stores, Inc. (Count II), Hughes Markets, Inc. (count III), Thriftimart, Inc. (count IV) and Alpha Beta Acme Markets, Inc., Arden-Mayfair, Inc., The Boys' Markets, Inc., Food Fair Stores, Inc., Food Giant Markets, Inc., Safeway Stores, Inc., and Von's Grocery Co. (count V). He appeals from order granting probation.

The basic facts, largely established by stipulation, are undisputed. Between February 1, 1969, and February 1, 1970, in Los Angeles and Burbank, defendant directly and through his employees picked up shopping carts within a six-block area of the chain stores of Ralph's, Lucky's, Thriftimart, Arden-Mayfair, Alpha Beta Acme, Food Giant, Food Fair, Safeway, Boys', Von's and Hughes Markets, respectively, each cart bearing the name of the store within the said block areas. These pickups were from parkways, streets, alleys, sidewalks or other places open to the public. Each shopping cart was of the approximate value of $25; the total value of carts picked up per chain exceeded $200 in value. The carts were owned by the respective markets at the times of their removal from the market premises. The carts under this stipulation were not removed from the market property by defendant or his employees; at the time they were picked up by defendant or his employees the carts were not in the physical custody of personnel of the markets but had been left by customers at the locations where they were picked up by defendant (this stipulation does not cover all of the carts picked up by defendant since some of those retrieved by him were beyond the six-block limit). Ralph's, Mayfair, Alpha Beta, Food Giant, Food Fair, Super Fair, Thriftimart, Safeway, Boys', Von's and Lucky's Markets put signs in prominent places on their carts and on their premises (including parking lots) prohibiting removal of the

carts, and they had no intention of parting with the carts even though they might be removed from the premises.[1]

As to Arden-Mayfair, Alpha Beta Acme, Food Giant, Food Fair, Super Fair, Thriftimart, Ralph's, Safeway, Hughes, Boys', Von's and Lucky Markets, at no time during 1969 did defendant have their permission or consent to have possession of those carts bearing their names, nor did any of them sell any of their carts to defendant. It was further stipulated that an executive from each of the aforementioned markets be deemed to have been called and sworn and to have testified that during the period of time in question they either had a cart return service servicing each store or their own box boys going into the surrounding area on a regular basis covering the area up to six blocks from the respective store.

Apart from the foregoing stipulations the record establishes that defendant effected the takings through the Independent Cart Recovery Company operated by him by means of a flatbed truck which, manned by a crew of two or three (sometimes by defendant himself), circulated through the streets in the area surrounding the various markets starting with a block away. They found shopping carts on sidewalks and in alleys and in the streets. In isolated instances defendant picked up carts across the street and from the market lot. When a truck load (about 50 carts) was collected the truck was returned to defendant's cart storage lot where the carts were unloaded and shoved into line with other carts from the same store. Approximately 500 carts a week were picked up if the crew worked every day.

The evidence is unclear as to the time element[2] but at some point after picking up carts belonging to various markets (a "couple," probably about five days) defendant notified them that the carts were in his possession and requested they pay a "finder's fee" of $2.50 per cart, warning the stores that if they did not pay the fee the carts would be sold. If a store did not pay as demanded (and few did) defendant then caused the stamped identification numbers to be ground off the carts and any other indicia

---

[1]Hughes Market is not included in this stipulation because Hughes permits customers to remove carts from its premises. The record is somewhat confused as to whether Hughes should be deemed included to the extent that the stipulation deals with the markets' intention not to part with their carts even if the carts are removed from the market grounds, but a reasonable reading of the record yields the conclusion that the exclusion was not meant to affect the applicability of this portion of the stipulation to Hughes.

[2]The record contains a great deal of evidence as to how long defendant kept the carts before disposing of them, this on the apparent assumption that his compliance or noncompliance with the provisions of the finder's statute dealing with the sale of the found property and the vesting of title in the finder (see Civ. Code, §§ 2080.3 and 2080.5) might prove to be a decisive issue. Inasmuch as hereinafter we determine that defendant is not within the finder's statute, this evidence is wholly irrelevant.

of their origin and ownership removed or painted over, and sold them to some other market, usually an individual store or smaller chain (Marvin's, Shop-Rite); defendant then stenciled the names of the purchasing markets on the carts in the areas from which the name of the original market had been ground off; he sold the carts for $5 and $10 apiece depending on their condition; at one time defendant had approximately 2,000 carts in his lot. None of the markets involved herein with the exception of Thrifti-mart and Alpha Beta ever redeemed its carts from defendant; none ever purchased from him any carts that had been taken from another market.

Every market has either a cart retrieval service with which it has contracted for the regular return of carts or box boys who make periodic trips around the immediate area picking up carts in parking lots, streets, alleys, apartment houses, garages, etc., within an area of four to six to eight blocks from the store. They know generally who is in the habit of taking carts from market premises and where they might be found. The director of security for Ralph's testified that the old and infirm, who live nearby and who do not own automobiles are primarily responsible for the removal of carts from market premises; that despite the fact that the identity of the takers generally becomes known to the store over a period of time and (at least in Los Angeles) a municipal ordinance (§ 41.45, Los Angeles Municipal Code) forbids the removal of shopping carts from market grounds on penalty of fine, no attempt beyond posting of signs adverted to above was made to prevent the taking of carts by customers —this because the market did not wish to offend the takers and drive them to competing stores—and that in his opinion the other chain markets pursue essentially the same policy with regard to the enforcement of prohibitions on cart removal. The secretary-treasurer, Hughes Markets, testified that while the store and its pickup service might not know the name and address of each customer who removes a cart from store premises, there are specific places within the six- to twelve-block area surrounding each store in the chain where the takers tend to leave the carts.

The proprietor of a cart retrieval service (which charges $6.50 for 25 carts), which during 1969 had contracts with 14 individual stores in the Von's, Hughes' and Dale's chains, testified that before entering the area surrounding any of the markets which he services, his regular operators know where approximately 50 percent of the carts can be found; his service has come to know who takes the carts because the same persons tend to take carts over and over again, in fact, it has determined over a period of time on what days persons among the takers habitually shop; 85 percent of the carts are found within a radius of five blocks of the store and another 13 percent within a 10-block radius, only 2 percent are found farther than 10 blocks from the store; by covering the area

surrounding the markets "you find the shopping carts. There isn't hardly [*sic*] a *lost* shopping cart within a five or six block area"; and a reasonable charge for picking up a cart and returning it to a store is 25 cents per cart (the foregoing was corroborated by the testimony of other witnesses who own or are employed by other retrieval services).

In the period between February 1, 1969, and February 1, 1970, defendant and his employees were regularly seen by employees of cart retrieval services hired by the markets, box boys and other market employees, picking up their carts and loading them on defendant's truck. At various times defendant called market executives and employees demanding $2.50 apiece for their own carts. In these conversations and in others with investigators, defendant bragged that after the first of the year he would put 40 new trucks on the street to pick up their carts, that he has "17 warehouses with 30,000 carts," that he has "got two warehouses, about 30,000 of them [carts]," that he is thinking of shipping some to Mexico, and Hertz Truck Rental is thinking of going into business with him, that he built a new building in North Hollywood and is "really in business," and that he has quite a large number of trucks operating between San Francisco and Mexico; and threatened to deprive Thriftimart of their carts to the point customers would be carrying their merchandise around in their arms, and he would have thousands of Food Giant's shopping carts within a year and would dispose of them through an outlet in Texas as well as in the Los Angeles area.

■ Appellant's arguments are directed to his basic claim that the evidence fails to show the crime of grand theft because his conduct is sanctioned by section 2080, Civil Code. In arguing that his activities in taking the carts and seeking to collect a finder's fee come within the provisions of section 2080,[3] he acknowledges that section 485, Penal Code,[4] omits any mention of a reasonable charge for caring for the property found, but asserts that section 2080, as a more recent enactment, controls to the extent that sections 485 and 2080 may differ. Assuming *arguendo* that appellant's analysis of the interrelation between the two sections is

[3]Section 2080: "Any person who finds a thing lost is not bound to take charge of it, but if he does so he is thenceforward a depositary for the owner, with the rights and obligations of a depositary for hire. Any person who finds and takes possession of any money, goods, things in action, or other personal property, or saves any domestic animal from drowning or starvation, shall, within a reasonable time, inform the owner, if known, and make restitution without compensation, except a reasonable charge for saving and taking care of the property."

[4]Section 485: "One who finds lost property under circumstances which give him knowledge of or means of inquiry as to the true owner, and who appropriates such property to his own use, or to the use of another person not entitled thereto, without first making reasonable and just efforts to find the owner and to restore the property to him, is guilty of theft."

correct, his claim of protection under section 2080 and that his activities were not prohibited under any of the theft provisions of the Penal Code (§ 484 et seq., Pen. Code) depends upon whether the shopping carts picked up by him within a six-block radius of the respective markets were "lost" property within the meaning of that term as used in sections 2080 and 485. If they were not, neither section applies and the cause must be determined under the general theft sections of the Penal Code (§§ 484, 486, 487).

The term "lost" as used in sections 485 and 2080 appears to have been used in its ordinary legal sense; that is the clear implication of the concurrent use in those sections of language common in the law of lost property. For instance, in section 2080.7, Civil Code, one of the various sections included in the finder's statute, the term "abandoned" is used with reference to a separate category of property not meant to be covered by the lost property provision; and in both sections 485 and 2080, reference is made to the finder's obligation to the "true owner." There is no language in any of the Civil Code sections constituting the finder's statute or in section 485, Penal Code, which indicates that the Legislature intended any special meaning to be given to the term in the context of either statute.

Appellant cites no California cases to support his claim that the carts were in fact "lost" property, and our research has disclosed none; he relies on two out-of-state cases. In the first, *Flood* v. *City Nat. Bank of Clinton* (1934) 218 Iowa 898 [253 N.W. 509, 95 A.L.R. 1168], money taken from a bank by bank robbers was later abandoned by them in a pile of junk and there found by Flood. In dealing with the question whether the stolen money could be deemed "lost" and whether Flood was entitled to a reward under a finder's statute in all material respects[5] like California's, the court had recourse to the dictionary definition of "lost." According to the dictionaries consulted therein the term means "Parted with," "gone out of one's possession," "taken from the possession of or denied to the efforts of," "taken away to some place unknown to the owner or former possessor," or "left as by accident, in a forgotten place." (218 Iowa 898, 902.) The court pointed out that the evidence showed that "the possession of the money in question was 'parted with' by the owner *involuntarily*. It also appears that said money was '*taken*

---

[5]The only significant difference is that the Iowa statute provides for a 10 percent reward to the finder whereas the California statute omits any reference to a reward. Inasmuch as the present statute (§§ 2080 through 2080.9, Civ. Code) superseded a statute (§ 1869, Civ. Code), which it appears did make provision for rewards to finders it seems probable that the Legislature intended to eliminate any previously existing right thereto when it enacted section 2080 et seq. in 1967. This difference between the Iowa and California statutes is immaterial in the present context.

*away to some place unknown to the owner.'* It further appears from the evidence that the money had 'gone out of the owner's possession' and that it was 'taken from the possession of or denied to the efforts of' the owner. The money had been taken from the bank early in the morning and was not returned until almost noon of the same day. During all that time the bank had no knowledge of the whereabouts of the money and had no control over it. When the money was found by the plaintiff, the bank was entirely ignorant of its whereabouts." (Pp. 902-903.) On the basis of the fact the bank involuntarily parted with its money and was ignorant of its location, the court held that the money was indeed "lost" when discovered by Flood.

The second case cited by appellant and relied on in *Flood* is *Automobile Ins. Co. of Hartford, Conn.* v. *Kirby* (1932) 25 Ala.App. 245 [144 So. 123], which involved a car stolen for use in a robbery and abandoned by the thieves at the scene of the robbery; there it was reduced to possession by Kirby who claimed a finder's fee under a statute like California's in every material respect, with the exception of the same feature hereinabove noted in the Iowa statute. After paying the fee to obtain release of the car to the true owner, the owner's insured sued Kirby for the return of the fee arguing that although its whereabouts was unknown to the owner at the time Kirby took possession, the car was not "lost" in the requisite sense. The court said at pages 246-247: "The rule as laid down by many authorities is: 'Goods or chattels are lost in the legal sense of the word only when the possession has been casually and involuntarily parted with, so that the mind has no impress of and can have no recourse to, the event.' [Citations.] Under the facts in this case there can be no doubt that the possession of the property was parted with involuntarily, so that the mind had no impress of, and could have no recourse to, the event. It follows that when the property is stolen and is afterwards abandoned by the thief at a place unknown to the owner, such property is lost within the meaning of our statute."

Neither *Flood* nor *Kirby* compels the conclusion that the carts were "lost." In those cases there was no question that the location of the stolen property was unknown to the true owner. In each case the thieves knew they did not have the owner's consent to the taking and would be prosecuted if caught, and fully intended to keep the stolen property for their own use and to avoid punishment for its theft; and in each case, as a necessary means to those ends, they attempted to conceal or use the property sufficiently far from the place from which it was taken that the owner and authorities would remain ignorant of its whereabouts. Here, although a Los Angeles municipal ordinance makes it a misdemeanor for patrons to remove carts from market premises, the evidence shows that

those patrons who took the carts off the lots had no intention of permanently depriving the markets of their property, they knew they had what amounted to tacit approval of the markets to the taking; they did not expect to be pursued, arrested and prosecuted and they thus had no motive to and did not conceal the carts, leaving them in plain sight in front of or around their homes so that the market's regular cart retrieval service or box boys could easily find them. As to the markets, all of them knew their carts were being removed from the premises by patrons, the reasons they were removed and in a general way (sometimes specifically) by whom. They knew with reasonable certainty within what areas and often in front of what houses the majority of the carts could be picked up. While the markets may not have known at any point in time exactly where each car was to be found, in a statistical sense they had a fairly accurate notion of where the vast bulk of their missing carts were. Further, the markets retrieved these carts on a regular basis employing pickup services which follow regular routes or sending their own employees out daily into the surrounding areas. On these facts we cannot conclude that the whereabouts of the carts removed by patrons from the premises were unknown to the markets, nor can it reasonably be said that the carts were "lost." Thus we need not consider whether the carts were involuntarily parted with. And in any event, as the foregoing passage quoted from the *Kirby* case makes clear, the question of voluntariness in the present context is really only a restatement of the issue of the owner's knowledge of the whereabouts of his property.

Appellant argues that inasmuch as the trial court found the carts were not "lost" then the only possible conclusion is that they were mislaid, citing out-of-state cases that distinguish between lost and mislaid articles. The fact is they were neither lost nor mislaid. The policy behind the distinction pointed up by appellant is that "[I]n the case of mislaid goods the mislayer will probably know where the goods are and will return to the place where he misplaced them, while the owner of goods which were lost rather than mislaid will probably be unaware of the *locus* of the goods. Therefore, in order to insure the return of misplaced goods the owner of the *locus* is deemed to possess them before the finder reduces them to his physical possession, and is a gratuitous bailee for the loser. In the case of lost goods, the desire to encourage finding, according to the reasoning of the courts, outweighs all other considerations since the loser's chance of recovering the lost goods will not be substantially affected by the decision to permit the finder to retain the goods." (Paulus, *Finder* v. *Locus in Quo—An Outline,* 6 Hastings L.J. 180, 190.) Here had defendant not taken the carts away first, the pickup services hired by the markets or market employees would soon have retrieved them. Rather

than releasing the carts to their lawful owners, there were specific instances in which defendant by force wrested a cart out of the hands of a market employee, took carts from market lots, and loaded carts onto his truck at the same time the regular market pickup service tried to retrieve them, maintaining they were "lost" and taking them so he could claim his "finder's fee." Mr. Smith, manager of a Ralph's store, one morning drove around surrounding streets to round up about 40 carts he saw in the area; two blocks from the store he saw defendant put a Ralph's cart on his truck and told him the cart belonged to him; defendant tried to wrest it away from him and he (Smith) ended up on the sidewalk with bruises; he tried again to get the cart whereupon defendant picked up a length of angle iron, made a threatening gesture, used profanity and threatened to kill him. Herb Davis, the proprietor of one of the pickup services with which the markets contracted, while picking up for one of the stores saw defendant in a truck picking up carts belonging to his clients; defendant knew who he was and he told defendant that he [defendant] was picking up his client's carts but defendant continued. Another time Davis and Fisher (an employee of defendant) saw defendant push five Hughes' Market carts off its lot onto his truck. Mr. Dye, owner of a pickup service, was picking up for Dale's Market and saw a boy pick up a cart ahead of him and take it to defendant parked on a side street; he told defendant who he was and that the cart was Dale's and asked for it; defendant said he was taking the cart anyway.

■ Since appellant's activities do not come within section 2080, Civil Code, we come to his contention that the evidence shows no intent to steal—"to appropriate property of another and permanently deprive him of its possession." (*People* v. *Turner,* 267 Cal.App.2d 440, 443 [73 Cal.Rptr. 263].) His supporting argument is predicated on his own testimony denying that he had the intent to permanently deprive the markets of their carts but took them pursuant to sections 1864, 1872[6] and 2080, Civil Code, and denying that he ever claimed the carts belonged to him. The trial court resolved the factual issue of intent against defendant and rejected his defense that he believed he was acting within the law. It found "there is no mistake of law or fact on the part of the defendant which absolves him of guilt" and on the "question of the intent," that defendant "intended to permanently deprive the owners of these carts if they didn't pay his expenses, plus a reward." Viewed in a light most favorable to respondent (*People* v. *Reilly,* 3 Cal.3d 421, 425 [90 Cal.Rptr. 417, 475 P.2d 649]) the evidence clearly supports the trial court's determination. It demonstrates that defendant, knowing the carts were the

[6]Article V, FINDING, consisting of sections 1864-1875, Civil Code, was repealed by Statutes 1967, chapter 1512, section 1.

property of the various markets, systematically appropriated them to his own use by taking them from areas where they had been left by patrons before the markets could retrieve them, holding the carts for a few days, accumulating various expenses in respect to them [consisting of the expenses incurred by defendant in the business he specifically set up to retrieve the carts]; making demands upon the owners to pay a ransom or reward ($2.50 for each cart) under what he terms the "finders-keepers law," knowing full well that the markets would not give in to his demand for a "finder's fee" 10 times the going rate (25 cents) in order to release the carts, upon refusal of the markets to pay, removing all serial numbers and indicia of ownership, and selling the carts to other markets—$5 for used and $10 for new carts—and keeping the proceeds. His intent to permanently deprive the markets of their property is reflected in defendant's high-handed method of operation and obvious lack of good faith in acting under the finder's statute. While he claimed to be operating under section 2080, Civil Code, he deliberately avoided compliance with subsequent sections. Thus upon the refusal of the markets to meet his demand of $2.50 per cart[7] (hardly "a reasonable charge" [§ 2080] but a "finder's fee" 10 times the going rate of 25 cents a cart which defendant well knew the markets would not pay), instead of turning the carts over to the police or sheriff's department for disposition which might have included sale (§§ 2080.1-2080.5, Civ. Code), defendant sold the carts as his own property and pocketed the entire proceeds turning the operation into a profitable, private business. Such an operation was certainly not within the contemplation of the Legislature in enacting the finder's statute. We cannot say that the trial court's findings are unsupported by substantial evidence.

The judgment (order granting probation) is affirmed.

Wood, P. J., and Thompson, J., concurred.

A petition for a rehearing was denied September 2, 1971, and appellant's petition for a hearing by the Supreme Court was denied October 27, 1971. Mosk, J., did not participate therein.

---

[7]It appears that defendant calculated his $2.50 fee at some point prior to the enactment of the present finder's statute in 1967 since fully half of his demanded fee he admittedly attributes to his right to a reward. (See former § 1867, Civ. Code.) The balance is made up of insurance, use of the truck, labor costs, storage, etc.