[No. S062739. Nov. 5, 1998.]

THE PEOPLE, Plaintiff and Respondent, v.
KENNETH D. DAVIS, Defendant and Appellant.

## COUNSEL

Anne V. Moore and John Hardesty, under appointments by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Robert Carl Schneider, Sanjay T. Kumar, Frederick Grab and Kerrigan M. Keach, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

MOSK, J.—We granted review to determine what crime is committed in the following circumstances: the defendant enters a store and picks up an item of merchandise displayed for sale, intending to claim that he owns it and to "return" it for cash or credit; he carries the item to a sales counter and asks the clerk for a "refund"; without the defendant's knowledge his conduct has been observed by a store security agent, who instructs the clerk to give him credit for the item; the clerk gives the defendant a credit voucher, and the agent detains him as he leaves the counter with the voucher; he is charged with theft of the item. In the case at bar the Court of Appeal held the defendant is guilty of theft by trespassory larceny. We agree, and therefore affirm the judgment of the Court of Appeal.

*Facts*

Defendant entered a Mervyn's department store carrying a Mervyn's shopping bag. As he entered he was placed under camera surveillance by store security agent Carol German. While German both watched and filmed, defendant went to the men's department and took a shirt displayed for sale from its hanger; he then carried the shirt through the shoe department and into the women's department on the other side of the store. There he placed the shirt on a sales counter and told cashier Heather Smith that he had "bought it for his father" but it didn't fit and he wanted to "return" it. Smith asked him if he had the receipt, but he said he did not because "it was a gift." Smith informed him that if the value of a returned item is more than $20 and there is no receipt, the store policy is not to make a cash refund but to issue a Mervyn's credit voucher. At that point Smith was interrupted by a telephone call from German; German asked her if defendant was trying to "return" the shirt, and directed her to issue a credit voucher. Smith prepared the voucher and asked defendant to sign it; he did so, but used a false name. German detained him as he walked away from the counter with the voucher.

Upon being questioned in the store security office, defendant gave a second false name and three different dates of birth; he also told German that he needed money to buy football cleats, asked her if they could "work something out," and offered to pay for the shirt.

Count 1 of the information charged defendant with the crime of petty theft with a prior theft-related conviction, a felony-misdemeanor (Pen. Code, § 666), alleging that defendant did "steal, take and carry away the personal property" of Mervyn's in violation of Penal Code section 484, subdivision (a).[1] In a motion for judgment of acquittal filed after the People presented their case, defendant argued that on the facts shown he could be convicted of no more than an *attempt* to commit petty theft, and therefore sought dismissal of the petty theft charge. (Pen. Code, § 1118.1.) The court denied the motion.

The only theories of theft submitted to the jury in the instructions were theft by larceny and theft by trick and device. The jury found defendant guilty of petty theft as charged in the information. Defendant waived further jury trial, and the court found the allegation of a prior conviction to be true. The court denied defendant's motion to treat the petty theft as a misdemeanor and sentenced him to state prison.

The Court of Appeal deemed defendant's primary contention to be that the evidence was insufficient to support his conviction of petty theft on either theory submitted to the jury. The court held defendant could properly have been convicted of theft by larceny; the court therefore declined to reach the alternate theory of theft by trick and device, and affirmed the judgment. We granted review.

# I

When the formerly distinct offenses of larceny, embezzlement, and obtaining property by false pretenses were consolidated in 1927 into the single crime of "theft" defined by Penal Code section 484, most of the procedural distinctions between those offenses were abolished. But their substantive distinctions were not: "The elements of the several types of theft included within section 484 have not been changed, however, and a judgment of

---

[1]Insofar as it defines theft by larceny, Penal Code section 484, subdivision (a), provides simply that "Every person who shall feloniously steal, take, carry, lead, or drive away the personal property of another . . . is guilty of theft." The statute is declaratory of the common law. (See code comrs. note foll. Ann. Pen. Code, § 484 (1st ed. 1872, Haymond & Burch, comrs.-annotators) pp. 188-190 [citing numerous English cases]; Stats. 1850, ch. 99, §§ 60, 61, p. 235 [declaring guilty of grand or petty larceny "Every person who shall feloniously steal, take, and carry, lead, or drive way the personal goods or property of another"].)

conviction of theft, based on a general verdict of guilty, can be sustained only if the evidence discloses the elements of one of the consolidated offenses." (*People* v. *Ashley* (1954) 42 Cal.2d 246, 258 [267 P.2d 271].)

■ The elements of theft by larceny are well settled: the offense is committed by every person who (1) takes possession (2) of personal property (3) owned or possessed by another, (4) by means of trespass and (5) with intent to steal the property, and (6) carries the property away. (See, e.g., *People* v. *Earle* (1963) 222 Cal.App.2d 476, 477-478 [35 Cal.Rptr. 265]; *People* v. *Edwards* (1925) 72 Cal.App. 102, 112-116 [236 P. 944]; CALJIC No. 14.02; Perkins & Boyce, Criminal Law (3d ed. 1982) pp. 292-335 (hereafter Perkins).) The act of taking personal property from the possession of another is always a trespass[2] unless the owner consents to the taking freely and unconditionally[3] or the taker has a legal right to take the property. (Perkins, *supra*, at pp. 303-304.) The intent to steal or *animus furandi* is the intent, without a good faith claim of right, to permanently deprive the owner of possession. (*Id.* at pp. 326-327.) And if the taking has begun, the slightest movement of the property constitutes a carrying away or asportation. (*Id.* at pp. 323-325.)

■ Applying these rules to the facts of the case at bar, we have no doubt that defendant (1) took possession (2) of personal property—the shirt—(3) owned by Mervyn's and (4) moved it sufficiently to satisfy the asportation requirement. Defendant does not contend otherwise.

Defendant does contend, however, that the elements of trespass and intent to steal are lacking. He predicates his argument on a distinction that he draws by dividing his course of conduct into two distinct "acts." According to defendant, his first "act" was to take the shirt from the display rack and carry it to Smith's cash register. He contends that act lacked the element of intent to steal because he had no intent to permanently deprive Mervyn's *of the shirt*; he intended to have the shirt in his possession only long enough to exchange it for a "refund." His second "act," also according to defendant, was to misrepresent to Smith that he had bought the shirt at Mervyn's and to accept the credit voucher she issued. He contends that act lacked the element of trespass because the store, acting through its agent German, *consented* to the issuance of the voucher with full knowledge of how he came into possession of the shirt.

---

[2]This is not traditional trespass onto real property, of course, but trespass *de bonis asportatis* or trespass "for goods carried away." (Perkins, *supra*, at p. 304.)

[3]When the consent is procured by fraud it is invalid and the resulting offense is commonly called larceny by trick and device. (*People* v. *Edwards*, *supra*, 72 Cal.App. at p. 113; CALJIC No. 14.05.)

Defendant's argument misses the mark on two grounds: it focuses on the wrong issue of consent, and it views that issue in artificial isolation from the intertwined issue of intent to steal.

To begin with, the question is not whether Mervyn's consented to Smith's issuance of the voucher after defendant asked to "return" the shirt; rather, the question is whether Mervyn's consented to defendant's taking the shirt in the first instance. As the Court of Appeal correctly reasoned, a self-service store like Mervyn's impliedly consents to a customer's picking up and handling an item displayed for sale and carrying it from the display area to a sales counter with the intent of purchasing it; the store manifestly does not consent, however, to a customer's removing an item from a shelf or hanger if the customer's intent in taking possession of the item is to steal it.

Although we have found no California case addressing the precise question, a recent decision of the Ohio Court of Appeals is relevant. In *State* v. *Higgs* (Ohio Ct.App. Jan. 12, 1990, No. WD-89-6) 1990 WL 1351, the defendant entered a Sears, Roebuck store and was observed on camera by store security agents as he removed a paper bag from his pocket, took a toy airplane from the merchandise display, and put it in the bag. He then carried the bag to a cashier and told her that the airplane had been a gift to his son but he was "returning" it because his son was too young for the toy. A security agent telephoned the cashier and instructed her to proceed with the transaction; the cashier gave the defendant a cash refund, and the security agents detained him. He was convicted of theft by larceny. '

On appeal, the defendant contended inter alia that although the indictment charged theft of the toy airplane, the evidence showed the crime was, instead, theft of the cash refund by means of false pretenses; that the store, acting through its agents, consented to the refund and thereby vitiated an element of the crime; and that in any event the store also consented to customers' carrying merchandise around the store without first paying for it.

Rejecting those claims and affirming the conviction, the appellate court reasoned: "The fact that a retail store permits customers to carry merchandise from one area of the store to another does not imply consent to conceal the merchandise in a bag and return the same for a cash refund. [Citation.] This act, not the act of taking the refund, constituted the criminal offense for which appellant was charged. . . . [¶] The fact that Sears consented to permitting a refund for the toy airplane was not relevant to the disposition of this case. The item unlawfully taken was the airplane, not the money. The record reveals neither Sears nor its authorized agents consented to the taking of that airplane." (*State* v. *Higgs*, *supra*, 1990 WL 1351, pp. *3-*4; accord,

*State* v. *Martin* (Ohio Ct.App. Dec. 6, 1996, No. 95-1-139) 1996 WL 761215, p. *4 [defendant obtained "refund" for shirts she took from a display but claimed as a gift; "the criminal act in this case did not take place when [defendant] accepted the refund receipt, but instead occurred when [defendant] told the sales associate that the shirts had been given to her sons."].)

In these circumstances the issue of consent—and therefore trespass—depends on the issue of intent to steal. We turn to that issue.

As noted earlier, the general rule is that the intent to steal required for conviction of larceny is an intent to deprive the owner *permanently* of possession of the property. (*People* v. *Brown* (1894) 105 Cal. 66, 69 [38 P. 518]; *People* v. *Jaso* (1970) 4 Cal.App.3d 767, 771-772 [84 Cal.Rptr. 567]; *People* v. *Turner* (1968) 267 Cal.App.2d 440, 444 [73 Cal.Rptr. 263, 38 A.L.R.3d 940].) For example, we have said it would not be larceny for a youth to take and hide another's bicycle to "get even" for being teased, if he intends to return it the following day. (*People* v. *Brown, supra*, 105 Cal. at p. 69.) But the general rule is not inflexible: "The word 'permanently,' as used here is not to be taken literally." (Perkins, *supra*, at p. 327.) Our research discloses three relevant categories of cases holding that the requisite intent to steal may be found even though the defendant's primary purpose in taking the property is not to deprive the owner permanently of possession: i.e., (1) when the defendant intends to "sell" the property back to its owner, (2) when the defendant intends to claim a reward for "finding" the property, and (3) when, as here, the defendant intends to return the property to its owner for a "refund." There is thus ample authority for the *result* reached in the case at bar; the difficulty is in finding a rationale for so holding that is consistent with basic principles of the law of larceny. The cases in these three categories offer a variety of such rationales, some more relevant or more persuasive than others. We review them seriatim.[4]

---

[4]Other categories of cases of temporary taking amounting to larceny have also been recognized. Thus the commentators agree there is an intent to steal when the *nature* of the property is such that even a temporary taking will deprive the owner of its primary economic value, e.g., when the property is dated material or perishable in nature or good for only seasonal use. (E.g., Perkins, *supra*, at p. 327 [taking cut flowers from a florist without consent, with intent to return them in a week]; Model Pen. Code & Commentaries, com. 6 to § 223.2, p. 175 [taking a neighbor's lawn mower without consent for the summer, with intent to return it in the fall].) Another such category is composed of cases in which the defendant takes property with intent to use it temporarily and then to *abandon* it in circumstances making it unlikely the owner will recover it. (E.g., *State* v. *Davis* (1875) 38 N.J.L. 176, 178 [horse and carriage abandoned on a public road "after many miles and hours of reckless driving"]; *State* v. *Ward* (1886) 19 Nev. 297 [10 P. 133, 135-136] [two horses abandoned on

## A. *The "sale" cases*

The classic case of the first category is *Regina* v. *Hall* (1848) 169 Eng.Rep. 291. The defendant, an employee of a man named Atkin who made candles from tallow, took a quantity of tallow owned by Atkin and put it on Atkin's own scales, claiming it belonged to a butcher who was offering to sell it to Atkin. The jury were instructed that if they found the defendant took Atkin's property with the intent to sell it back to him as if it belonged to another and appropriate the proceeds, he was guilty of larceny. The jury so found, and the conviction was upheld on further review.

The defendant contended that his assertion of temporary ownership of the property for a particular purpose was not enough to constitute the required intent to permanently deprive. The justices expressed two rationales for holding to the contrary. First, one justice stressed that the deprivation would in fact have been permanent unless the owner had agreed to the condition imposed by the defendant, i.e., to "buy" the property: Baron Parke reasoned, "The intention was that the goods should never revert to the owner as his own property except by sale. They were therefore severed from the owner completely unless he chose to buy back what was in truth his own property." (*Regina* v. *Hall*, *supra*, 169 Eng.Rep. at p. 291.)

The second rationale was that the defendant's claim of the right to sell the property was an assertion of a *right of ownership* and therefore evidence of an intent to permanently deprive: Chief Justice Denman reasoned, "The only question attempted to be raised here is as to the *animus furandi*, the intent to deprive the owner of his property. What better proof can there be of such intent, than the assertion of such a right of ownership by the prisoner as to entitle him to sell it." (*Regina* v. *Hall*, *supra*, 169 Eng.Rep. at p. 292; accord, *Regina* v. *Manning* (1852) 169 Eng.Rep. 619 [defendant took bags owned by a potato-bag dealer, presented them to the dealer as new bags, and demanded payment for them; held, larceny].)

The latter rationale—that an intent to permanently deprive is shown by the assertion of a right of ownership in the property—was again invoked when *Regina* v. *Hall*, *supra*, 169 Eng.Rep. 291, was distinguished from a case in which a pieceworker sought to increase his pay by adding goods produced by other workers to those produced by him: in that case Justice Erle explained, "The distinction between the two is sufficiently clear. The test is, whether the person who takes the property assumes to exercise dominion over it as owner. In *R[egina]* v. *Hall*, the offer to sell the property to the

open road miles from ranch where taken]; *State* v. *Langis* (1968) 251 Or. 130 [444 P.2d 959, 960] [automobile taken with intent to leave it in city seventy miles away].)

owner was one of the strongest acts of dominion." (*Regina* v. *Poole* (1857) 7 Cox Crim. Cas. 373, 374.)[5]

Perkins offers yet another rationale for the rule that a defendant who takes property for the purpose of "selling" it back to its owner has the requisite intent to permanently deprive: by so doing the defendant creates a *substantial risk of permanent loss*, because if the owner does not buy back his property the defendant will have a powerful incentive to keep it in order to conceal the theft. As Perkins explains, "in the type of case suggested there is also a very considerable risk that [the owner] will not get back the property at all. If, for example, he should decide that his supply was ample and decline to pay the price, the trespasser would take away the property in order to conceal his own wrongdoing." (Perkins, *supra*, at p. 329.) As will appear, we find this rationale persuasive.

### B. *The "reward" cases*

The cases in the second category hold that a defendant who takes property for the purpose of claiming a reward for "finding" it has the requisite intent to permanently deprive. Again the courts invoke differing rationales for this holding.[6] One line of these cases is exemplified by *Commonwealth* v. *Mason* (1870) 105 Mass. 163. The defendant took possession of a horse that had strayed onto his property, with the intent to conceal it until the owner offered a reward and then to return it and claim the reward, or until the owner was induced to sell it to him for less than its worth. The court affirmed a conviction of larceny on the theory that the requisite felonious intent was shown because the defendant intended to deprive the owner of "a portion of the value of the property." (*Id.* at p. 168.) The court did not explain this theory further, but later cases suggested that the "portion of the value" in question was the right to claim a reward—ordinarily less than the property's full value—for its return.

Thus in *Slaughter* v. *State* (Ga. 1901) 38 S.E. 854, the defendants were private detectives who induced an employee to steal merchandise from a

---

[5]The cited case and others (*Regina* v. *Holloway* (1848) 169 Eng.Rep. 285; *Rex* v. *Webb* (1835) 168 Eng.Rep. 1332) represent the English view that such fraud by a pieceworker is not larceny. There is later American authority to the contrary. (*Fort* v. *State* (1887) 82 Ala. 50 [2 So. 477] [farmworkers paid by weight of cotton they picked took already weighed cotton from farmer's storehouse and added it to their unweighed cotton; held, larceny].)

[6]A decision of the Court of Criminal Appeal for Ireland (*Regina* v. *O'Donnell* (1857) 7 Cox Crim. Cas. 337) is often cited as a leading case on the subject of larceny by taking property for reward or ransom. A careful reading of the *O'Donnell* opinion, however, suggests the court held only that the evidence supported the jury's finding that the defendant was guilty of violating an 1827 statute that prohibited taking a reward under the pretense of helping to recover stolen property. (See *id.* at p. 341 (per Monahan, C. J.) ["It is true there may not have been a larceny committed, but we think there was evidence to justify the jury in such a finding" of guilt under the statute.].)

store, then returned the merchandise to the store owner as "evidence" of the thefts and persuaded him to pay them a reward if they could catch the thief. The court affirmed a conviction of larceny, reasoning that "It is not necessary to constitute larceny, that the property should be itself permanently appropriated. It is sufficient if the property be taken and carried away with the intent to appropriate any pecuniary right or interest therein, as where it is taken with the expectation of claiming a reward for its return." (*Id.* at p. 855; accord, *Fort* v. *State*, *supra*, 2 So. 477 [". . . deprivation of the ownership of property is one of the essentials of larceny. But is it necessary that the intent shall be to deprive the owner of the whole property taken? Is not the *animus furandi* as manifestly shown when the intent is simply to deprive him of a partial, though unsevered, interest in the property?"].)

Another line of cases in this category also noted the taker's intent to appropriate "part of the value" of the property, but went on to emphasize a different rationale, i.e., that the taker had made the return of the property *contingent* on the offer of a satisfactory reward, and if the contingency did not materialize the taker would keep the property. A leading case of this type is *Berry* v. *State* (1877) 31 Ohio St. 219. The defendants took two horses from a stable without their owner's consent, with the intent to conceal them until the owner offered a reward, and then to return them and claim the reward. The court affirmed a conviction of larceny, rejecting the defendants' contention that their intent was to deprive the owner only temporarily of his property. As its principal reason, the court stressed that the defendants' intent to return the horses was *contingent* on the offer of a reward: "in this case there was an utter absence of intention to restore the property *unless* money was paid for its restoration. There was no evidence tending to show a purpose to return the property *unless* a reward was offered therefor.[7] A return, at all events, was not designed. It is true, that all parties concerned in the taking contemplated and expected that the owner would offer such reward; but the purpose to return was founded wholly on the contingency that a reward would be offered, and *unless the contingency happened the conversion was complete*." (*Berry* v. *State*, *supra*, at p. 227, italics added; accord, *Dunn* v. *State* (1895) 34 Tex.Crim. 257 [30 S.W. 227] [defendant took horse from corral with intent to conceal it until owner offered reward].)

The same rationale has been invoked when the defendant sought not a reward but a ransom. Thus in *State* v. *Hauptmann* (1935) 115 N.J.L. 412 [180 A. 809], the defendant kidnapped the infant son of Charles Lindbergh.

---

[7]This rationale, of course, recalls Baron Parke's reasoning that stolen goods offered for "sale" to the owner were "severed from the owner completely *unless* he chose to buy back what was in truth his own property." (*Regina* v. *Hall*, *supra*, 169 Eng.Rep. at p. 291, italics added.)

The child was wearing a sleeping suit when he was abducted. In preliminary negotiations with Condon, Lindbergh's representative, the defendant agreed to send Condon the sleeping suit as evidence that Condon was dealing with "the right party"; the negotiations continued, the defendant sent the sleeping suit to Condon, and Condon thereupon accepted the defendant's ransom terms. The child was later found dead. The defendant was convicted of murder and of larceny of the sleeping suit, and the New Jersey high court affirmed.

On appeal, the defendant contended inter alia that there was no larceny because his intent was not to keep the sleeping suit permanently but to return it in order to advance the ransom negotiations. The court's rationale for rejecting the claim was the same as that of the "reward" cases discussed above: "the intent to return should be unconditional; and, where there is an element of coercion or of reward, as a condition of return, larceny is inferable." (*State* v. *Hauptmann, supra,* 180 A. at p. 819.) The court acknowledged that the sleeping suit "was surrendered without payment; but, on the other hand, it was an initial and probably essential step in the intended extortion of money, and it seems preposterous to suppose that it would ever have been surrendered except as a result of the first conversation between Condon and the holder of the suit, and as a guaranty that there was no mistake as to the 'right party.' It was well within the province of the jury to infer that, if Condon had refused to go on with the preliminaries, *the sleeping suit would never have been delivered.* In that situation, the larceny was established." (*Id.* at pp. 819-820, italics added.)

The only relevant California cases we have found are two that fall into the reward/ransom category. They contribute little, however, to the rationales articulated in the prior cases.

Thus in *People* v. *Stay* (1971) 19 Cal.App.3d 166 [96 Cal.Rptr. 651], the defendant made a business of taking shopping carts from streets and sidewalks near supermarkets where they had been left by store customers, and then offering to return the carts if the stores paid him a "finder's fee" of 10 times the going rate charged by legitimate cart retrieval services; when a store refused to pay—as most did—the defendant removed all indicia of ownership from the carts and sold them to smaller stores. Convicted of grand theft, the defendant argued on appeal that the evidence showed no intent to deprive the stores permanently of the carts because his purpose was to take them only in order to collect the "reasonable charge" to which a "finder" is entitled by statute for saving and preserving "lost" property. (Civ. Code, § 2080.) Affirming the conviction, the Court of Appeal held that (1) the carts were not "lost" within the meaning of the finder's statute, and (2) the

evidence supported the trial court's finding that the defendant " 'intended to permanently deprive the owners of these carts if they didn't pay his expenses, plus a reward.' " (19 Cal.App.3d at p. 175.)

The case is not helpful, however, because the Court of Appeal does not state a rationale to support its holding on the intent issue. Instead, it simply reiterates the facts (*People* v. *Stay, supra,* 19 Cal.App.3d at p. 176) and concludes broadly that "His intent to permanently deprive the markets of their property is reflected in defendant's high-handed method of operation and obvious lack of good faith in acting under the finder's statute." (*Ibid.*) Yet one of the facts emphasized by the Court of Appeal—that the defendant "well knew the markets would not pay" the exorbitant finder's fee he demanded (*ibid.*)—made a sham of the defendant's claim that he took the carts only to collect the fee.

The second California case is *In re Albert A.* (1996) 47 Cal.App.4th 1004 [55 Cal.Rptr.2d 217]. The minor defendant took the bicycle of a minor named Ali by threat of force, saying he intended to keep it until his own bicycle, which had allegedly been stolen by a relative of Ali's, was returned to him. The juvenile court believed that was in fact the defendant's motive, but also believed he intended to keep Ali's bicycle " 'for as long as it would take' " to recover his own bicycle. (*Id.* at p. 1007.) For this reason the court found the defendant intended to permanently deprive Ali of the bicycle; the court concluded that the defendant had therefore committed robbery, and ruled that a prior order of wardship would continue in effect.

Affirming the order, the Court of Appeal agreed that the defendant had the requisite intent to permanently deprive. The court's theory appears to have been an extension of the "contingency rationale" of the prior cases. The court reasoned not just that the return of the property was contingent on a future event—the recovery of the defendant's own bicycle—but that the contingency was so "remote" and unlikely to occur—the court analogized it to "winning the lottery"—that it could be disregarded as a matter of law: "The intent to return property under these circumstances is tantamount to an intent to permanently deprive the victim of his or her property because the intent to return the property is too tenuous and illusory to have any legal effect." (*In re Albert A., supra,* 47 Cal.App.4th at p. 1009.) Whatever its theoretical validity, this seems an exaggerated view of the facts of the case.[8]

Finally, Perkins again proposes the rationale of a substantial risk of permanent loss. He reasons that a taking with intent to hold for reward

---

[8]In *People* v. *Turner* (1983) 145 Cal.App.3d 658 [193 Cal.Rptr. 614], the defendant took jewelry and cash from his kidnapping victim, to be returned on condition that she take him to her house so as to enable him to continue a sexual assault on her. The court held the facts would not support an instruction that a temporary taking does not constitute robbery. The

creates such a risk because "the intent will result in a permanent loss to the owner if he fails to offer or give a reward for the return of the property." (Perkins, *supra*, at p. 330.) Indeed, even the offer or payment of a reward may not eliminate the risk because the defendant still has an incentive to keep the property rather than expose himself to detection by returning it.

### C. The "refund" cases

The third category comprises a substantial number of recent cases from our sister states affirming larceny convictions on facts identical or closely similar to those of the case at bar: in each, the defendant took an item of merchandise from a store display, carried it to a sales counter, claimed to own it, and asked for a "refund" of cash or credit. Although the cases are thus factually in point, the reasoning of their opinions is, ironically, of less assistance than the "sale" or "reward" cases in our search for a satisfactory rationale on the issue of the intent to permanently deprive. This is so for three reasons.

First, many of the opinions in the "refund" cases offer no rationale at all on the issue of intent. Instead, in each case the defendant contends the evidence is insufficient to support the conviction of larceny, and the appellate court simply reviews the facts and concludes otherwise without further analysis. (E.g., *Gunn* v. *State* (Ala.Crim.App. 1980) 387 So.2d 280, 282; *Warsham* v. *State* (1991) 200 Ga.App. 322 [408 S.E.2d 122, 123]; *Marshall* v. *State* (1991) 199 Ga.App. 678 [405 S.E.2d 893, 894]; *State* v. *Manus* (Ohio Ct.App. Aug. 6, 1982, No. C.A. H-82-9) 1982 WL 9177, p. *5; see also *State* v. *Cravanas* (Ohio Ct.App. Mar. 20, 1996, No. 17398) 1996 WL 122016, p. *3 ["theft by deception"]; *State* v. *Gibson* (Ohio Ct.App. Oct. 22, 1986, No. C.A. 12621) 1986 WL 11923 [same].)[9]

Second, in other cases in this category the opinion either states (e.g., *State* v. *Brookover* (Ohio Ct.App. Feb. 22, 1983, No. 82X19) 1983 WL 3129, p. *2; *Moore* v. *State* (Tex.App. 1983) 659 S.W.2d 445, 447) or implies (e.g., *State* v. *Webster* (Mo.Ct.App. 1994) 870 S.W.2d 450, 453; *State* v. *Wynn* (Mo.Ct.App. 1990) 794 S.W.2d 312, 315; *Lewis* v. *State* (Tex.App. Apr. 27,

court's rationale is unclear (see *id.* at p. 680), but it may have had in mind a view similar to that expressed in *State* v. *Hauptmann*, *supra*, 180 A. 809, i.e., that an intent to return on condition that the owner submit to an unlawful coercion should be deemed an intent to permanently deprive. (*Id.* at p. 819.)

[9]We may also note a number of cases on similar facts in which the defendant does not even question on appeal the sufficiency of the evidence to support the conviction of larceny. (E.g., *People* v. *Goodwin* (1997) 59 Cal.App.4th 1084 [69 Cal.Rptr.2d 576]; *Shafter* v. *State* (Fla.Dist.Ct.App. 1979) 374 So.2d 1127; *People* v. *Jones* (1993) 245 Ill.App.3d 674 [185 Ill.Dec 814, 615 N.E.2d 373]; *State* v. *Wilkerson* (Mo.Ct.App. 1990) 786 S.W.2d 236; *City of Columbus* v. *Luu* (Ohio Ct.App. Aug. 4, 1988, No. 88 AP-175) 1988 WL 81883.)

1989, No. 01-88-00079-CR) 1989 WL 40710, pp. *2-*3) that the defendant was charged with theft of the *cash* obtained as a refund, rather than theft of the property taken from the display counter. We are concerned with the latter: as noted at the outset, defendant in the case at bar was charged with theft of "personal property" of Mervyn's, i.e., the shirt.[10]

Third, the remaining opinions in this category are statute-specific, i.e., each turns on the wording of the larceny statute in force in that particular jurisdiction. As noted above (fn. 1, *ante*), the California statute making larceny a crime is declaratory of the common law and is therefore to be construed by application of common law principles. By contrast, the cases now under discussion arise in jurisdictions that have modernized their larceny statutes by adopting, or enacting variations on, the provisions of the Model Penal Code governing theft. (*Id.*, §§ 223.0-223.9.)[11] Accordingly, to the extent these opinions provide any legal analysis at all, they do so in terms of the wording of their governing statutes rather than the common law.

For example, in *State* v. *Martin, supra*, 1996 WL 761215, the defendant took four shirts from a display in a department store, carried them to a sales counter and asked for a refund, saying they had been gifts to her sons; the clerk gave the defendant a receipt for a refund; and a store security agent who had observed the defendant's course of conduct detained her before she left the store. The defendant was convicted of violating an Ohio statute declaring guilty of theft whoever shall knowingly "obtain or exercise control over" the property of another, without consent and "with purpose to deprive" the owner of the property. (Ohio Rev. Code Ann. § 2913.02, subd. (A).)[12] On appeal, the reviewing court held the defendant's conduct came within the terms of the statute: the court reasoned that "By claiming she had ownership of the shirts, [defendant] exercised control over the shirts in a manner which was contrary to the store's ownership. In effect, there was a verbal concealment and exertion of control by [defendant]." (1996 WL 761215 at p. *4.)

[10]The cited decisions will be relevant to a case in which a defendant is charged with theft of a *refund*. For example, they address and reject the contention that the store should be deemed to have "consented" to issuance of the refund because its security agent had observed the defendant's course of conduct yet had allowed or even "authorized" the refund. As the Missouri court aptly put it, "A reasonable inference would be that J.C. Penney did not and would not consent to providing a refund on an item [defendant] did not purchase and did not own. The security officer's observance did not rise to the level of consent. If we accept [defendant's] logic, retailers would be placed in the difficult position of only being able to prosecute thefts they did not observe." (*State* v. *Wynn, supra*, 794 S.W.2d 312, 315.)

[11]At least one state has gone so far as to enact a statute that specifically targets conduct like that of the defendant in the case at bar: Michigan declares guilty of "retail fraud" any person who, in a store, "With intent to defraud, obtains or attempts to obtain money or property from the store as a refund or exchange for property that was not paid for and belongs to the store . . . ." (Mich. Comp. Laws Ann. § 750.356c, subd. (1)(c).)

[12]The Ohio theft statute is based on the Model Penal Code's definition of theft by larceny. (Model Pen. Code, § 223.2, subd. (1).)

Turning to the issue of the defendant's intent to "deprive," the court stressed that the Ohio statutory definition of that term included the act of withholding property "with purpose to restore it only upon payment of a reward or other consideration" (Ohio Rev. Code Ann. § 2913.01, subd. (C)(1)).[13] The court reasoned, "Under the foregoing definition, if the defendant takes the property of another and does not intend to give it back until consideration is paid, the defendant has 'deprived' the victim first, of the property, and second, of the consideration." (*State* v. *Martin, supra,* 1996 WL 761215 at p. *4.)

Weaving these two themes together, the court concluded: "By telling the sales associate that the shirts had been given to her sons as gifts, [defendant] exercised verbal control and concealment, thus, exerting control over the shirts for the purpose of obtaining consideration from the store." (*State* v. *Martin, supra,* 1996 WL 761215 at p. *4.)

We have set forth the Ohio court's reasoning in order to show how closely it follows the wording of the local statute—and, by the same token, how far it has moved away from the common law of larceny. The same is true, moreover, of the other cases in this category: their reasoning is often more conclusory than that of the Ohio case just discussed, but the statutes on which they rely are equally remote from the common law, and hence from the question before us. (E.g., *Jones* v. *State* (Tex.App. Nov. 29, 1995, No. 04-95-00334-CR) 1995 WL 699987 [construing Tex. Penal Code, § 31.03, subds. (a) & (b) ("theft" is committed by one who "unlawfully appropriates" property of another without the owner's "effective consent" and with intent to "deprive"); § 31.01, subd. (2)(B) ("deprive" means "to restore property only upon payment of reward or other compensation"); and § 31.01, subd. (3)(D) ("effective consent" does not include consent "given solely to detect the commission of an offense")]; accord, *Ashby* v. *State* (Tex.Crim.App. 1980) 604 S.W.2d 897, 900-901 (plur. opn.).)

## II

Several of the rationales articulated in the "sale" and "reward" cases, however, are also applicable to the "refund" cases. On close analysis, moreover, the relevant rationales may be reduced to a single line of reasoning that rests on both a principled and a practical basis.

First, as a matter of principle, a claim of the right to "return" an item taken from a store display is no less an assertion of a *right of ownership* than the

---

[13]Like this provision, the Ohio statute's entire definition of "deprive" (Ohio Rev. Code Ann. § 2913.01, subd. (C)) is based on the Model Penal Code's definition of the term (Model Pen. Code, § 223.0, subd. (1)).

claim of a right to "sell" stolen property back to its owner. (*Regina* v. *Hall, supra,* 169 Eng.Rep. 291, 292.) And an intent to return such an item to the store only if the store pays a satisfactory "refund" is no less *conditional* than an intent to return stolen property to its owner only if the owner pays a satisfactory "reward." (*Berry* v. *State, supra,* 31 Ohio St. 219, 227.) Just as in the latter case, it can be said in the former that "the purpose to return was founded wholly on the contingency that a [refund] would be offered, and unless the contingency happened the conversion was complete." (*Ibid.*) It follows that a defendant who takes an item from a store display with the intent to claim its ownership and restore it only on condition that the store pay him a "refund" must be deemed to intend to permanently deprive the store of the item within the meaning of the law of larceny.

Second, as a practical matter, the risk that such a taking will be permanent is not a mere theoretical possibility; rather, by taking an item from a store display with the intent to demand a refund a defendant creates a substantial risk of permanent loss. (See Perkins, *supra,* at p. 329.) This is so because if the defendant's attempt to obtain a refund for the item fails for any reason, he has a powerful incentive to keep the item in order to avoid drawing attention to the theft. A person who has taken an item from a store display and has claimed the right to "return" it at a sales counter, but has been rebuffed because, for example, he has no receipt, will not be inclined to run the risk of confirming the suspicions of the sales clerk or store security personnel by *putting the item back* in the display. Instead, just as in the case of a failed attempt to "sell" property back to its owner, "the trespasser would take away the property in order to conceal his own wrongdoing." (*Ibid.*)

This, too, is not a mere theoretical possibility: our research discloses a number of cases in which a defendant, rebuffed in an attempt to "return" an item taken from a display in the same store, simply took the item with him when he left the store. The most recent example is the California case of *People* v. *McLemore* (1994) 27 Cal.App.4th 601 [32 Cal.Rptr.2d 687]. There the defendant entered a store empty-handed but subsequently asked a sales clerk to "exchange" a dress he was then carrying; the clerk became suspicious when she noticed that the dress still bore an electronic sensor and a complete sales tag (such tags were normally torn in half when items were purchased). The clerk called the manager, who asked for a receipt. The defendant became angry and demanded the dress back, insisting it was his. The manager handed him the dress, and the defendant left the store with it.

Similarly, in *Ray* v. *State* (Tex.App. June 4, 1992, No. 01-91-00322-CR) 1992 WL 117452, the defendant took shoes from a store display and asked for a refund at the checkout counter. After the clerk twice asked for a receipt

and he twice failed to produce one, the defendant became angry and the clerk called the manager. When the manager reiterated the demand for a receipt, the defendant asked for a bag, the clerk put the shoes in it, and the defendant left the store with the shoes.

In *Head* v. *State* (1992) 203 Ga.App. 730 [417 S.E.2d 398, 399], the defendant entered a Kmart store empty-handed; later she brought two hats and two dresses to the customer service desk, asked for a refund for the hats, and, claiming she had previously bought one of the dresses at another Kmart store, sought to exchange that dress for the other. The customer service representative declined these requests because the defendant had no receipts for any of the merchandise. The defendant then said she would pay for the first dress at the checkout counter, and asked the customer service representative to put the other three items in a bag while she was doing so. Upon returning from the checkout counter, the defendant retrieved the bag and left the store with the merchandise.

In *Grady* v. *State* (Tex.Crim.App. 1971) 466 S.W.2d 770, 771, the defendant took an electric saw from a store display and asked a clerk for a refund. When she was unable to produce a receipt, the clerk told her to go to the customer service counter. Instead, the defendant went in the opposite direction and left the store with the saw. (See also *People* v. *Dungy* (1984) 122 Ill.App.3d 314 [77 Ill.Dec 862, 461 N.E.2d 485, 487] [defendant took a purse from a mannequin on the fifth floor of a department store and asked for a refund; when she was unable to obtain a refund she left the counter and took a "down" escalator, still carrying the purse.].)

## III

Applying the foregoing reasoning to the facts of the case at bar, we conclude that defendant's intent to claim ownership of the shirt and to return it to Mervyn's only on condition that the store pay him a "refund" constitutes an intent to permanently deprive Mervyn's of the shirt within the meaning of the law of larceny, and hence an intent to "feloniously steal" that property within the meaning of Penal Code section 484, subdivision (a) (fn. 1, *ante*). Because Mervyn's cannot be deemed to have consented to defendant's taking possession of the shirt with the intent to steal it, defendant's conduct also constituted a trespassory taking within the meaning of the law of larceny. It follows that the evidence supports the final two elements of the

offense of theft by larceny, and the Court of Appeal was correct to affirm the judgment of conviction.[14]

Our conclusion is not affected by the case on which defendant principally relies, *People* v. *Marquez* (1993) 16 Cal.App.4th 115 [20 Cal.Rptr.2d 365] (*Marquez*). In discussing an unrelated issue, the *Marquez* court distinguished the California law of larceny from that of Oregon on the ground that California follows the common law in requiring an intent to "permanently" deprive the owner of the property taken, while the Oregon larceny statute includes an intent to deprive the owner of the property "for so extended a period or under such circumstances" that the owner loses "the major portion of its economic value . . . ." (Or. Rev. Stat. § 164.005, subd. (2)(a).) In a passage that defendant repeatedly quotes, the *Marquez* court then asserted: "A person who intends only to *temporarily* deprive an owner of property, albeit while acquiring or depriving the owner of the main *value* of the property, does not intend to *permanently* deprive the owner of the property and therefore does not have the intent to commit theft, as that crime is defined under California law." (16 Cal.App.4th at p. 123, italics in original.) We need not determine whether the quoted assertion is a correct statement of California law.[15] For now it is enough to observe that *Marquez, supra,* 16 Cal.App.4th at page 123, is distinguishable on its facts: here, defendant did not intend to borrow the shirt temporarily, use it for a while, and then return it to Mervyn's diminished in value; rather, as we have seen, he intended to permanently deprive Mervyn's of the shirt.

At oral argument defendant contended that from the wording of a special theft statute, Penal Code section 484.1 (hereafter section 484.1), we should infer that the Legislature does not intend the general theft statute, Penal Code section 484 (hereafter section 484), to apply to the conduct in the case at bar.[16] Defendant relies on subdivision (a) of section 484.1, enacted in 1988, which provides that "Any person who knowingly gives false information or provides false verification as to the person's true identity or as to the person's ownership interest in property or the person's authority to sell property in order to receive money or other valuable consideration from a

---

[14]This determination makes it unnecessary to address defendant's contention that he cannot be convicted of larceny by trick and device or obtaining property by false pretenses.

[15]We have found no California case in which the defendant had the intent hypothesized by the court in *Marquez, supra,* 16 Cal.App.4th at page 123. As noted above (fn. 4, *ante*), commentators appear to believe that such an intent constitutes an intent to steal at common law. If and when such a case arises in California it will be time enough to determine whether that rule is in fact part of the common law of larceny of which Penal Code section 484 is declaratory.

[16]Insofar as relevant to this argument, subdivision (a) of section 484 declares guilty of theft every person "who shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money, labor or real or personal property . . . ."

pawnbroker or secondhand dealer and who receives money or other valuable consideration from the pawnbroker or secondhand dealer is guilty of theft."

As we understand it, defendant's contention at oral argument was based on the following unstated syllogism. Major premise: if section 484 applied to the act of defrauding a pawnbroker or secondhand dealer by falsely claiming ownership of the property pawned or sold, the Legislature would have had no reason to enact section 484.1. Minor premise: the act punished by section 484.1 and defendant's act of attempting to defraud Mervyn's of a "refund" by falsely claiming ownership of the shirt are similar enough that we should draw the conclusion that section 484 does not apply to defendant's act either.

Review of the legislative history of section 484.1, however, shows that defendant's major premise is inaccurate. The sponsor of the bill that led to the enactment of section 484.1 (Assem. Bill No. 3888 (1987-1988 Reg. Sess.) (hereafter Assembly Bill No. 3888)) was a trade association representing pawnbrokers and secondhand dealers. The legislative committee reports on the bill disclose that (1) the Legislature was aware that the act of defrauding pawnbrokers and secondhand dealers was already included in the general prohibition of section 484 against defrauding "any . . . person," and (2) the Legislature nevertheless enacted a statute—section 484.1—specifically applying the prohibition of section 484 to pawnbrokers and secondhand dealers, for two reasons.

First, "Many pawnbrokers and secondhand dealers would like to post this new code section [i.e., section 484.1] in a conspicuous place in their shops to discourage the presentation of false identification and representations and to justify to their customers their intense concern for correct identification and representations." (Assem. Com. on Pub. Saf., Rep. on Assem. Bill No. 3888 for hearing of May 23, 1988, p. 1 (hereafter Assembly Report); accord, Sen. Com. on Judiciary, Rep. on Assem. Bill No. 3888 for hearing of Aug. 2, 1988, p. 2 (hereafter Senate Report).)

Second, when stolen property that has been pawned or sold is recovered, it is returned to its true owner, not to the pawnbroker and secondhand dealer; in that event, "the pawnbroker and secondhand dealer become the victims of the crime to the extent that they paid out or loaned money on the property." (Assem. Rep., *supra*, p. 1; accord, Sen. Rep., *supra*, p. 2.) To remedy that loss, the bill further provided that upon conviction the court may order the defendant to "make restitution to the pawnbroker or secondhand dealer in an amount not exceeding the actual losses sustained . . . ." (Now § 484.1, subd. (b).)

Because the Legislature thus had a reason—indeed, two reasons—to enact section 484.1 despite its overlap in coverage with section 484, defendant's argument that section 484 does not apply to his conduct fails.[17]

For the foregoing reasons the judgment of the Court of Appeal is affirmed.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.

---

[17]In a supplemental brief defendant offers a new argument, i.e., that the two statutes address different conduct because the victim's *reliance* on the fraudulent misrepresentation (1) is an element of theft by false pretenses under section 484 but (2) is assertedly not an element under section 484.1. For the latter proposition, defendant cites only CALJIC No. 14.19; but the CALJIC statement of the elements of section 484.1 simply tracks the statute, and the statute is silent on the element of reliance. Yet that silence is not necessarily significant: section 484 is also silent on the element of reliance, but the cases nevertheless hold that reliance is an element of theft by false pretenses under that statute. (E.g., *People* v. *Ashley, supra,* 42 Cal.2d 246, 259.) No case has yet determined whether reliance is also an element of theft by false pretenses from pawnbrokers and secondhand dealers under section 484.1, and that question is obviously not presented in the case at bar.