Filed 8/26/13

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S195187 |
| v. | ) | |
| | ) | Ct.App. 2/7 B222845 |
| DEMETRIUS LAMONT WILLIAMS, | ) | |
| | ) | Los Angeles County |
| Defendant and Appellant. | ) | Super. Ct. No. MA046168 |
| _____ | ) | |

Defendant used re-encoded payment cards to buy gift cards at a department store. After the store's security guards were alerted to the scam, they asked defendant to show them the gift card receipts and the payment cards used. Defendant did so. When he was told that the numbers on the cards did not match those on the receipts, he began walking away, ignored the security guards' requests to stop, and then shoved one of the guards. After a brief struggle, defendant was handcuffed. Defendant was later charged with and convicted of several offenses, including, as relevant here, robbery and theft. He here challenges his robbery convictions.

An element of robbery is the "*felonious taking* of personal property in the possession of another . . . ." (Pen. Code, § 211, italics added; all further statutory references are to the Penal Code.) At issue is the type of theft that constitutes a "felonious taking." Is it only theft by larceny, as defendant argues? Or can it also be theft by false pretenses (the type of theft defendant committed), as the Attorney

General contends?  According to the Court of Appeal, which upheld defendant's robbery convictions, theft by false pretenses can satisfy the "felonious taking" requirement of robbery.  We granted defendant's petition for review, and we now reverse the Court of Appeal's judgment.

## I

On July 4, 2009, defendant Demetrius Lamont Williams entered a Walmart department store in Palmdale.  Using either a MasterCard or a Visa payment card, which was re-encoded with a third party's credit card information, defendant bought a $200 Walmart gift card from a recently hired cashier, who was filling in for a cashier on a break.[1]  Defendant then tried to buy three more gift cards from the same cashier.  At that point, the regular cashier came back and, after learning of the previous transaction, told defendant of Walmart's policy prohibiting the use of credit cards for purchases of gift cards.  Defendant was permitted to keep the $200 gift card he had initially bought.

Defendant then went to a different cash register and again presented a re-encoded payment card to buy another $200 gift card.  The transaction was observed by a Walmart security guard who, accompanied by another guard, asked defendant for the receipt and payment card used.  Defendant complied.  When told that the payment card's last four digits did not match those on the receipt, defendant produced two other re-encoded payment cards, but their numbers did not match those on the receipt either.

Defendant began walking toward the exit, followed by the two security guards.  When defendant was told to stop, he produced yet another re-encoded payment card, but this card's last four digits also did not match those on the

---

[1]  Because the record is unclear as to the specific kind of cards used by defendant for the fraudulent purchase of the store gift cards, we simply use the term "payment card."

2

receipt. As defendant continued walking toward the exit, he pushed one of the guards, dropped some receipts, and started running away. After a brief struggle inside the store, the guards wrestled defendant to the ground and handcuffed him. Recovered from defendant's possession were four payment cards issued by MasterCard and Visa. Also retrieved from defendant were several gift cards from Walmart and elsewhere.

Defendant was charged with four counts of second degree robbery (§ 211), one count of second degree burglary (§ 459), one count of fraudulent use of an access card (§ 484g), one count of grand theft (§ 487, subd. (a)), and three counts of forgery (§ 484i, subd. (b)), a total of 10 counts. The information also alleged defendant had one prior serious or violent felony conviction (robbery) within the meaning of the "Three Strikes" law (§ 667). Regarding the grand theft count, the court instructed the jury on grand theft by false pretenses. The jury found defendant guilty as charged, and the trial court sentenced him to a total prison term of 23 years eight months. The Court of Appeal reversed defendant's forgery convictions for insufficient evidence and modified the judgment to stay imposition of the burglary sentence under section 654, which prohibits punishment for more than one crime arising from a single indivisible course of conduct (see *People v. Latimer* (1993) 5 Cal.4th 1203, 1207-1208). In all other respects, the Court of Appeal affirmed the trial court's judgment, including defendant's robbery convictions.

As he did in the Court of Appeal, defendant here argues his robbery convictions should be reversed because robbery requires theft by larceny, whereas the theft he committed was by false pretenses. We agree.

3

## II

Robbery is "the *felonious taking* of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211, italics added.)  The term "felonious taking" originated in the common law and was later adopted in California's robbery statute.  (*People v. Tufunga* (1999) 21 Cal.4th 935, 947 (*Tufunga*).)  At issue here is the meaning of "felonious taking."  Can that element of robbery be satisfied only by the crime of theft by larceny, as defendant argues?  Or can it also be committed through theft by false pretenses, as the Attorney General contends?

To help us ascertain the meaning that the Legislature intended when it used the words "felonious taking" in California's robbery statute (§ 211), we need to examine that statute's common law roots.  We do so below.  Part A discusses the common law origins and development of the related crime of larceny.  Part B discusses the British Parliament's enactment in the 18th century of the two statutory offenses of theft by false pretenses and embezzlement,[2] both of which were later adopted in the early criminal laws of the American states.  Part C discusses the elements of robbery, larceny, and theft by false pretenses, and their application to this case.

---

[2]    Before 1707, the legislative body that enacted the laws of England was the English Parliament.  In that year, the kingdoms of England and Scotland joined and became known as the United Kingdom of Great Britain, and their shared parliament became known as the Parliament of Great Britain. (<http://www.parliament.uk/about/living-heritage/evolutionofparliament/ legislativescrutiny/act-of-union-1707> [as of Aug. 26, 2013].)  Thus, when referring to parliamentary acts occurring after the year 1707, we refer to the British Parliament as opposed to the English Parliament.

4

## A. Crime of Larceny

California statutorily defines the crime of theft by larceny as the felonious stealing, taking, carrying, leading, or driving away of the personal property of another. (§ 484, subd. (a).) That statutory definition reflects its English common law roots. (*People v. Davis* (1998) 19 Cal.4th 301, 304, fn. 1 (*Davis*).)

Unlike statutory law, whose authority rests upon an express declaration by a legislative body, the common law "consists of those principles and forms which grow out of the customs and habits of a people," enshrined in law by virtue of judicial decisions. (1 Burdick, Law of Crime (1946) § 5, pp. 16-17 (Burdick).) Much of the law developed in English courts was later applied in England's American colonies and then, after independence, in this nation's states. (See *id*. at pp. 18, 33-47.) As used in this opinion, the term "common law" denotes a "body of judge-made law . . . developed originally in England." (Garner, A Dictionary of Modern Legal Usage (2d ed. 1995) p. 177.) And, as used here, the term "common law crime" means a "crime that [was] punishable under the common law, rather than by force of statute." (Garner, Black's Law Dictionary (9th ed. 2009) p. 427.)

The common law defined larceny as the taking and carrying away of someone else's personal property, by trespass, with the intent to permanently deprive the owner of possession. (See 2 Burdick, *supra*, § 496i, p. 261, citing 4 Blackstone, Commentaries 229.) Larceny was considered to be an offense less serious than robbery because of robbery's additional requirement of personal violence against, or intimidation of, the victim. (Perkins & Boyce, Criminal Law (3d ed. 1982) Offenses Against Property, p. 344 (Perkins).) Not that the distinction made any difference to the accused: Under the common law, robbery

5

and larceny were felonies, and all felonies were punishable by death.  (*Id.* at p. 290.)

In 1275, the English Parliament enacted a statutory exception to punishment of death for all felonies.  (2 Burdick, *supra*, § 554, pp. 328-329, citing Statute of Westminster I, ch. 15 (1275).)  The statute created a sentencing distinction between "grand" and "petit" larceny, making grand larceny a more serious offense than petit larceny, involving property valued at greater than 12 pence (the approximate price of a sheep).  (*People v. Ortega* (1998) 19 Cal.4th 686, 694 (*Ortega*); see also 2 Burdick, *supra*, § 554, pp. 328-329; Perkins, *supra*, at p. 290.)  Under the 1275 statute, grand larceny remained punishable by death; but petit larceny became punishable only by imprisonment, whipping, or forfeiture of goods.  (See *Ortega*, *supra*, at p. 694, citing 3 Wharton, Criminal Law (15th ed. 1995) § 344, p. 361; Perkins, *supra*, at p. 290.)  Larceny remained a felony, however, irrespective of whether it was grand or petit.  (*Ortega*, *supra*, at p. 694.)  Therefore, larceny was, in essence, a felonious taking.  (See 2 Burdick, *supra*, § 496i, p. 261, citing 4 Blackstone, Commentaries 229, 232 [Blackstone's definition of common law larceny, circa 1765].)

Until the latter part of the 18th century, death was the punishment for all theft offenses except petty larceny.  (3 LaFave, Substantive Criminal Law (2d ed. 2003) § 19.2, pp. 60-61 (LaFave), citing Model Pen. Code, com. to § 223.1, pp. 128-129.)  By that time, English society and its judiciary had become troubled by that excessively harsh punishment for theft crimes.  (Perkins, *supra*, at p. 290.)  This concern led the English courts to limit the scope of larceny.  (*Id.* at pp. 290-291; 3 Torcia, Wharton's Criminal Law (15th ed. 1995) Larceny, § 342, p. 349.)  For instance, it was held not to be larceny — and not a crime at all — if someone in lawful possession of another's property misappropriated it for personal use (the later offense of embezzlement), or if someone acquired title to another's property

6

by fraud (the later offense of false pretenses). (See 3 LaFave, *supra*, at p. 57; see also 2 Burdick, § 562, pp. 338-339, § 621, p. 456.) These limitations to the law of larceny made sense in light of that crime's original purpose of preventing breaches of the peace; because embezzlement and false pretenses lacked larceny's requirement of a "trespass in the taking," they were viewed as less likely to result in violence. (3 LaFave, *supra*, at p. 57.)

Although common law larceny was in some ways narrowed to limit punishment by death, the scope of larceny was in other ways broadened to provide greater protection of private property. (See 3 LaFave, *supra*, at p. 57.) For instance, in 1799 an English court decision introduced the concept of "larceny by trick." (*Rex v. Pear* (1779) 168 Eng.Rep. 208; Note, *Larceny, Embezzlement and Obtaining Property by False Pretenses* (1920) 20 Colum. L.Rev. 318, 319 (Note); see also Perkins, *supra*, at pp. 304-305 [citing *Tunnard's Case* (1729) 2 East P.C. 687, for first introducing the concept of "larceny by trick," but noting it was the later case of *Rex v. Pear* that "gave real impetus to this new development"].) Larceny by trick, a form of larceny, involves taking possession of another's property by fraud. (3 Torcia, Wharton's Criminal Law, *supra*, § 343, p. 350.)

As mentioned at page 5, *ante*, larceny requires a *trespassory* taking, which is a taking without the property owner's consent. (*People v. Edwards* (1925) 72 Cal.App. 102, 113 (*Edwards*).) Although a trespassory taking is not immediately evident when larceny occurs "by trick" because of the crime's fraudulent nature, English courts held that a property owner who is fraudulently induced to transfer possession of the property to another does not do so with free and genuine consent, so "the one who thus fraudulently obtains possession commits a trespass . . . ." (2 Burdick, *supra*, § 535, p. 301; see also 3 Torcia, Wharton's Criminal Law, *supra*, § 343, p. 350; 2 Witkin, Cal. Criminal Law (4th ed. 2012) Crimes Against

7

Property, § 15, p. 39 ["the fraud takes the place of the trespass and the defendant is guilty of larceny by trick or device."].) A California Court of Appeal decision explained nearly 90 years ago: "Though the taking [in larceny] must be against the will of the owner or a trespass to his possession, still an actual trespass or actual violence is not necessary. Fraud may take the place of force . . . . In [cases of larceny by trick] the fraud vitiates the transaction, and the owner is deemed still to retain a constructive possession of the property." (*Edwards*, *supra*, 72 Cal.App. at p. 113; see *Davis*, *supra*, 19 Cal.4th at p. 305, fn. 3 ["When the consent is procured by fraud it is invalid and the resulting offense is commonly called larceny by trick . . . ."].)

The reasoning supporting larceny by trick's inclusion within the crime of larceny — that fraud vitiates the property owner's consent to the taking — was not extended, however, to cases involving the fraudulent transfer of title. (3 LaFave, *supra*, § 19.1(b), p. 61, § 19.6(a), p. 99, § 19.7(a), p. 114; see also Perkins, *supra*, at p. 308.) Under the common law, if title was transferred, there was no trespass and hence no larceny. (2 Burdick, *supra*, § 535, p. 302; Perkins, *supra*, at p. 307.) The theory was that once title to property was voluntarily transferred by its owner to another, the recipient owned the property and therefore could not be said to be trespassing upon it. (2 Burdick, *supra*, § 564, p. 302; Perkins, *supra*, at p. 307.) Similarly, under the common law there was no trespass, and hence no larceny, when a lawful possessor of another's property misappropriated it to personal use. (2 Burdick, *supra*, at p. 340.) These subtle limitations on the common law crime of larceny spurred the British Parliament in the 18th century to create the separate statutory offenses of theft by false pretenses and embezzlement (see *id*. at p. 341; *id*. at pp. 471-472; 3 LaFave, *supra*, at pp. 61, 99, 114; Perkins, *supra*, at p. 308), as discussed below.

8

## B. Crimes of Theft by False Pretenses and Embezzlement

In 1757, the British Parliament enacted a statute prohibiting theft by false pretenses. (30 Geo. II, ch. 24 (1757).) Forty-two years later, it enacted a statute prohibiting embezzlement. (39 Geo. III, ch. 85 (1799).) Each was considered a statutory offense separate and distinct from the common law crime of larceny. (3 LaFave, *supra*, § 19.1(b), p. 61.) Unlike larceny, the newly enacted offense of theft by false pretenses involved acquiring title over the property, not just possession. (Perkins, *supra*, at pp. 363-364.) Unlike larceny, the newly enacted offense of embezzlement involved an initial, lawful possession of the victim's property, followed by its misappropriation. (2 Burdick, *supra*, § 564, p. 339.)

Britain's 18th-century division of theft into the three separate crimes of larceny, false pretenses, and embezzlement made its way into the early criminal laws of the American states. That import has been widely criticized in this nation's legal community because of the seemingly arbitrary distinctions between the three offenses and the burden these distinctions posed for prosecutors. (See, e.g., Perkins, *supra*, at p. 291 ["The intricacies of this patchwork pattern [of theft crimes] are interesting as a matter of history but embarrassing as a matter of law-enforcement. . . . The wrongful appropriation of another's money or chattels, with the willful intent to deprive the other thereof permanently, should constitute just one offense . . . ."]; 3 LaFave, *supra*, § 19.1(b), p. 61 ["As we now look back on history, matters would have been simpler . . . if Parliament had stretched larceny rather than creating new crimes . . . ."]; Note, *supra*, 20 Colum. L.Rev. 318 [criticizing the distinctions among the three crimes as an unnecessary impediment to law enforcement]; *Van Vechten v. American Eagle Fire Ins. Co.* (1925) 239 N.Y. 303, 306 [Justice Benjamin Cardozo, then at the New York Court of Appeals, writing that the central distinction between larceny and embezzlement

9

failed to "correspond to any essential difference in the character of the acts"]; *Com. v. Ryan* (1892) 155 Mass. 523, 527 [Justice Oliver Wendell Holmes, Jr., then at the Massachusetts Supreme Judicial Court, describing the separation of embezzlement and larceny as a "historical accident[]"].)

For instance, it was difficult at times to determine whether a defendant had acquired title to the property, or merely possession, a distinction separating theft by false pretenses from larceny by trick. (See, e.g., *People v. Delbos* (1905) 146 Cal. 734; see also 2 Burdick, *supra*, at p. 303.) It was similarly difficult at times to determine whether a defendant, clearly guilty of some theft offense, had committed embezzlement or larceny, as an 1867 Massachusetts case illustrates. There, a defendant was first indicted for larceny and acquitted; later, on the same facts, he was indicted for embezzlement and convicted; and thereafter, on appeal, his conviction was set aside on the ground that his offense was larceny, not embezzlement. (*Com. v. O'Malley* (1867) 97 Mass. 584; see also Note, *supra*, 20 Colum. L.Rev. at pp. 322-323 [describing the above case as an example of the need to consolidate the three theft offenses].)

In the early 20th century, many state legislatures, recognizing the burdens imposed on prosecutors by the separation of the three crimes of larceny, false pretenses, and embezzlement, consolidated those offenses into a single crime, usually called "theft."[3] (3 LaFave, *supra*, § 19.8(c), p. 145; see Note, *supra*, 20 Colum. L.Rev. at pp. 323-324 [describing early consolidation statutes].) The California Legislature did so in 1927, by statutory amendment. (§ 484, subd. (a); enacted in 1872, amended by Stats. 1927, ch. 619, § 1, p. 1046.) In a 1954

---

[3] New York's statute consolidating the offenses, enacted in 1909, is labeled "Larceny," not theft. (N.Y. Penal Law, § 155.05; *id*., former § 1290.) Similarly, the British Parliament consolidated the three offenses under the Larceny Act of 1916. (6 & 7 Geo. V, ch. 50 (1916).)

10

decision, this court explained: "The purpose of the consolidation was to remove the technicalities that existed in the pleading and proof of these crimes at common law. Indictments and informations charging the crime of 'theft' can now simply allege an 'unlawful taking' [citation]. Juries need no longer be concerned with the technical differences between the several types of theft, and can return a general verdict of guilty if they find that an 'unlawful taking' has been proved [citations]. The elements of the several types of theft included within section 484 have not been changed, however, and a judgment of conviction of theft, based on a general verdict of guilty, can be sustained only if the evidence discloses the elements of one of the consolidated offenses." (*People v. Ashley* (1954) 42 Cal.2d 246, 258 (*Ashley*); accord, *Davis*, *supra*, 19 Cal.4th at pp. 304-305.)

As we pointed out in *Ashley*, the California Legislature's consolidation of larceny, false pretenses, and embezzlement into the single crime of theft did not change the elements of those offenses (*Ashley*, *supra*, 42 Cal.2d at p. 258), a fact that is significant to our analysis, as discussed below.

## C. Elements of Robbery, Larceny, and Theft by False Pretenses and Their Application Here

We now consider the issue here: whether robbery's element of "felonious taking" can be satisfied through theft by false pretenses, the type of theft defendant committed.

Robbery is "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) Reflected in that statutory definition are larceny's elements of "the taking of another's property, with the intent to steal and carry it away." (*People v. Gomez* (2008) 43 Cal.4th 249, 254-255 (*Gomez*).) The taking required in larceny, as in robbery, must be "felonious." (§ 484, subd. (a) ["Every person who shall *feloniously* steal, take, carry, lead, or

11

drive away the personal property of another . . . is guilty of theft" by larceny.] (italics added).)

By adopting in the robbery statute (§ 211) the phrase "felonious taking" that was used in the common law with regard to both robbery and larceny, the California Legislature in all likelihood intended to attach to the statutory phrase the same meaning the phrase had under the common law. (*Tufunga*, *supra*, 21 Cal.4th at p. 946.)

As explained on page 5, *ante*, all larceny at common law was a felony, and thus the common law defined larceny as a "felonious taking." (See also Perkins, *supra*, at p. 343; *State v. Lopez* (1980) 94 N.M. 349, 351-352 [" 'Felonious taking' means a taking with intent to commit the crime of larceny."].) Because California's robbery statute (§ 211) uses the common law's phrase "felonious taking," and because at common law "felonious taking" was synonymous with larceny, we conclude that larceny is a necessary element of robbery. (See *Gomez*, *supra*, 43 Cal.4th at p. 254 ["In robbery, the elements of larceny are intertwined with [robbery's] aggravating elements to make up the more serious offense."]; *People v. Crowley* (1893) 100 Cal. 478, 479 ["[L]arceny and robbery are generically the same — the one being merely an aggravated form of the other. Each is the felonious taking of the personal property of another, although in robbery the felonious taking is accomplished by force or threats."]; *People v. Nelson* (1880) 56 Cal. 77, 80 [" '[R]obbery is larceny, committed by violence, from the person of another.' "]; *People v. Jones* (1878) 53 Cal. 58, 59 ["an indictment for robbery must aver every fact necessary to constitute larceny, and more"].)

Two differences in the crimes of larceny and theft by false pretenses tend to support our conclusion that only theft by larceny, not by false pretenses, can fulfill the "felonious taking" requirement of robbery.

12

First, *larceny* requires "asportation," which is a carrying away of stolen property.  (*Gomez*, *supra*, 43 Cal.4th at p. 255, citing *People v. Lopez* (2003) 31 Cal.4th 1051, 1056.)  This element of larceny, although satisfied by only the slightest movement, continues until the perpetrator reaches a place of temporary safety.  (*Gomez*, at p. 255.)  Asportation is what makes larceny a continuing offense.  (*Id*. at p. 254.)  Because larceny is a continuing offense, a defendant who uses force or fear in an attempt to escape with property taken by larceny has committed robbery.  (*Id.* at pp. 259-260; *People v. Estes* (1983) 147 Cal.App.3d 23, 27-28.)  Similarly, the Attorney General asserts that defendant committed robbery because he shoved the Walmart security guards during his attempt to flee the store after acquiring the store gift cards through theft by false pretenses.

But *theft by false pretenses*, unlike larceny, has no requirement of asportation.  The offense requires only that "(1) the defendant made a false pretense or representation to the owner of property; (2) with the intent to defraud the owner of that property; and (3) the owner transferred the property to the defendant in reliance on the representation."  (*People v. Wooten* (1996) 44 Cal.App.4th 1834, 1842.)  The crime of theft by false pretenses ends at the moment title to the property is acquired, and thus cannot become robbery by the defendant's later use of force or fear.  Here, when defendant shoved the store security guards, he was no longer engaged in the commission of theft because he had already acquired title to the Walmart gift cards; therefore, defendant did not commit robbery.

Section 484's subdivision (a) does provide that "any false or fraudulent representation or pretense made shall be treated as *continuing*, so as to cover any money, property, or services received as a result thereof . . . ."  (Italics added.)  But that provision does not contemplate a physical continuation of the taking of property, unlike the asportation element of larceny, where the crime continues

13

until the thief has reached a place of temporary safety. Rather, the provision refers to the later acquisition by the defendant of "money, property, or service" as the result of the initial fraud involved in theft by false pretenses. (§ 484, subd. (a); see *People v. Frankfurter* (1952) 114 Cal.App.2d 680, 704.) In theft by false pretenses, it is the fraud that continues, not the physical taking of the stolen property.

We now consider another significant difference between larceny and theft by false pretenses. As previously noted on pages 5 and 7, *ante*, larceny requires a "trespassory taking," which is a taking without the property owner's consent. (*Edwards*, *supra*, 72 Cal.App. at p. 113.) This element of larceny, like all its other elements, is incorporated into California's robbery statute. (*Ortega*, *supra*, 19 Cal.4th at p. 694; 2 Burdick, *supra*, § 595, p. 408.) By contrast, theft by false pretenses involves the *consensual* transfer of possession as well as *title* of property; therefore, it cannot be committed by trespass. This is illustrated by the facts in a recent Court of Appeal decision, *People v. Beaver* (2010) 186 Cal.App.4th 107. There, the defendant staged an accident at his place of employment, a ski resort, to obtain medical expenses for a preexisting injury to his knee. The defendant was convicted of grand theft. The Court of Appeal reversed the conviction, holding that the jury was instructed on the incorrect type of theft — theft by larceny — and instead should have been instructed on theft by false pretenses. *Beaver* said: "The present matter did not involve a taking of property from another without his consent. [The ski resort] willingly paid for defendant's medical treatment on the false representation that [it] had caused defendant's injuries. This was theft by false pretenses, not larceny." (*Id.* at p. 121.) The essence of *Beaver*'s holding is this: Because the ski resort consented to paying for the defendant's medical treatment, the defendant did not commit a trespassory taking, and hence did not commit larceny.

14

Here too defendant did not commit larceny. Walmart, through its store employees, consented to transferring title to the gift cards to defendant. Defendant acquired ownership of the gift cards through his false representation, on which Walmart relied, that he was using valid payment cards to purchase the gift cards. Only after discovering the fraud did the store seek to reclaim possession. Because a "felonious taking," as required in California's robbery statute (§ 211), must be *without the consent* of the property owner, or "against his will" (*ibid*.), and Walmart *consented* to the sale of the gift cards, defendant did not commit a *trespassory* (nonconsensual) taking, and hence did not commit robbery. Moreover, unlike the offense of larceny by trick, in which a defendant's fraud vitiates the consent of the victim as a matter of law, the acquisition of title involved in the crime of theft by false pretenses precludes a trespass from occurring. (See pp. 7-8, *ante*.) Therefore, theft by false pretenses cannot satisfy the "felonious taking" element of robbery.[4]

The dissent proposes a theory, not discussed in the parties' briefs, to bring defendant within the robbery statute. It relies on section 490a, which states: "Wherever any law or statute of this state refers to or mentions larceny, embezzlement, or stealing, said law or statute shall . . . be read and interpreted as

---

[4]     In the dissent's view, "the outcome in this case [is] particularly troubling" because "no charge of felony murder robbery would lie" if a defendant who has committed theft by false pretenses killed a store employee while fleeing with the loot. (Dis. opn. of Baxter, J., *post*, at p. 19, fn. 7.) But this would also be true if a defendant killed a store employee while fleeing after committing *any crime* other than larceny. It is for the Legislature, not this court, to determine the scope of felony-murder robbery. (See *Tufunga*, *supra*, 21 Cal.4th at p. 950 ["[W]hether [an] amendment [to the robbery statute] would better reflect sound public policy is one properly addressed to [the Legislature] rather than to this court."].) Also, if a defendant enters a store with the intent to commit theft by false pretenses (as defendant did here), and if that defendant, while fleeing, kills a store employee, that defendant can be convicted of felony-murder burglary.

15

if the word 'theft' were substituted therefor." The gist of the dissent's reasoning is this: Section 490a says any law or statute that refers to or mentions larceny or stealing must be construed as meaning "theft"; although the robbery statute (§ 211) does not expressly mention larceny or stealing, it refers to them indirectly through the words "felonious taking," which should be interpreted under section 490a as meaning "theft," a crime that includes theft by false pretenses. Therefore, the dissent concludes, the "felonious taking" element in the robbery statute encompasses defendant's conduct in this case. (Dis. opn. of Baxter, J., *post*, p. 11.)

The dissent's theory would require us to conclude that, by enacting section 490a, the Legislature intended to alter two of the substantive elements of robbery: asportation and a trespassory taking. (See pp. 12-14, *ante*.) But the 1927 legislation enacting section 490a and the theft consolidation statute (§ 484, subd. (a); Stats. 1927, ch. 619, § 1, p. 1046) left unchanged the elements of theft. (*Ashley*, *supra*, 42 Cal.2d at p. 258.) We are not persuaded that the Legislature intended to alter the elements of *robbery*, to which section 490a makes no reference whatever, while also intending to leave intact the elements of *theft*, to which it explicitly refers. As this court said more than 80 years ago, "the essence of section 490a is simply to effect a change in nomenclature *without disturbing the substance of any law*." (*People v. Myers* (1929) 206 Cal. 480, 485, italics added.)[5]

---

[5] The dissent "would place greater reliance on the later decisions of this court" that, in the dissent's view, "have gone on to explain in greater detail the full legislative intent and purpose behind the consolidated theft statutes . . . ." (Dis. opn. of Baxter, J., *post*, at p. 9, fn. 4, citing *Gomez*, *supra*, 43 Cal.4th at p. 255, fn. 4 and *Ashley*, *supra*, 42 Cal.2d at p. 258.) But those cases do not at all undermine this court's 1929 holding in *People v. Myers*, *supra*, 206 Cal. 480. (See *Ashley*, *supra* [citing *Myers* with approval].)

16

### III

In resolving many complex legal issues, as Justice Oliver Wendell Holmes, Jr., observed, "a page of history is worth a volume of logic." (*New York Trust Co. v. Eisner* (1921) 256 U.S. 345, 349.) To determine the meaning of the words "felonious taking" in our statutory definition of robbery, we have delved into the sources of this statutory definition and, in turn, into the history of the common law crime of larceny and the statutory crime of theft by false pretenses. This review has led us to conclude that the words "felonious taking" in the robbery definition were intended to refer only to theft committed by larceny and not to theft by false pretenses.

The logic and fairness of this conclusion may be open to question because a thief who uses force to resist capture may be equally culpable whether the theft was committed by larceny (for example, ordinary shoplifting) or by false pretenses (as occurred here). Nevertheless, our task is simply to interpret and apply the laws as the Legislature has enacted them, not to revise or reform them to better reflect contemporary standards.

We reverse the Court of Appeal's judgment upholding defendant's four robbery convictions. Because other aspects of the Court of Appeal's decision may be affected by our reversal of defendant's robbery convictions, the matter is remanded to that court for further proceedings consistent with the views expressed in this opinion.

                                                                    KENNARD, J.

WE CONCUR:

CANTIL-SAKAUYE, C. J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
LIU, J.

17

**DISSENTING OPINION BY BAXTER, J.**

"Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (Pen. Code, § 211.)[1]  As this court has explained, "[r]obbery is larceny with the aggravating circumstances that 'the property is taken from the person or presence of another . . .' and 'is accomplished by the use of force or by putting the victim in fear of injury.' (*People v. Gomez* (2008) 43 Cal.4th 249, 254, fn. 2.)" (*People v. Anderson* (2011) 51 Cal.4th 989, 994 (*Anderson*).)  "The crime of robbery is a continuing offense that begins from the time of the original taking [and does not end] until the robber reaches a place of relative safety." (*People v. Estes* (1983) 147 Cal.App.3d 23, 28 (*Estes*).)  Hence, where the property is peacefully acquired, but force or fear is then used to facilitate the carrying away of the loot or the making good of an escape before the thief has reached a place of temporary safety, the crime is transformed into robbery.  (*Anderson*, at p. 994; *People v. Gomez, supra*, 43 Cal.4th at pp. 255-256 (*Gomez*); *Estes* at p. 28.)

Notwithstanding these settled principles, defendant contends a thief's use of force or fear to facilitate his flight from a retail store after acquiring purchases through theft by false pretenses, as when an altered credit or gift card is used to make a fraudulent purchase, as a matter of law can never be transformed into a robbery.  The majority agrees, reasoning that because theft by false pretenses lacks

---

[1]     All further statutory references are to the Penal Code.

1

the elements of a trespassory taking and asportation, "[t]he crime of theft by false pretenses ends at the moment title to the property is acquired, and thus cannot become robbery by the defendant's later use of force or fear." (Maj. opn., *ante*, at p. 13.) Under the majority's analysis, where the thief makes a fraudulent purchase or purchases with an altered credit card, itself a separately chargeable felony offense (see § 484g), as long as he gets past the cash register with the fraudulently purchased loot in hand, nothing he does thereafter to facilitate his escape with the stolen items, whether it be the use of physical force against store employees or security personnel, the placing of such persons in fear of injury or harm, the actual use of a weapon, or the threat to use an allegedly concealed weapon, can transform the theft into robbery.

This reasoning and result contradicts the legislative intent behind California's robbery and unified theft statutes. (§§ 211, 484, subd. (a), 490a.) It is in conflict with long-standing California jurisprudence, including several decisions of this court that have reached the opposite conclusion. And it is patently at odds with the important public policies served by the robbery statute. " 'Robbery violates the social interest in the *safety and security of the person* [robbed] as well as the social interest in the protection of property rights.' " (*Gomez, supra,* 43 Cal.4th at p. 264, quoting Perkins & Boyce, Criminal Law (3d ed. 1982) p. 350, italics added; see *People v. Scott* (2009) 45 Cal.4th 743, 749 ["Robbery is a crime of violence committed against a person."].) Both interests are implicated when a thief enters a business establishment, steals property, and then uses force or fear against a robbery victim or victims while fleeing, regardless of the particular manner of theft employed. I respectfully dissent.

## FACTS

The following facts are drawn from the opinion of the Court of Appeal. Defendant went to a Walmart store in Palmdale in July 2009. Michael Ortiz, a

cashier who had been working at the store for six months, testified he was covering register No. 22 during cashier Jackie Pena's break when defendant attempted to purchase four Walmart gift cards from him in two separate transactions. The exchange between defendant and the cashiers was recorded on the store's security cameras and played for the jury while Ortiz described his interaction with defendant.

During the first transaction, defendant came to register No. 22 and purchased a Walmart gift card in the amount of $200, paying for it with a "gold looking card" that he swiped through the card processing machine. After the transaction was approved, defendant attempted to purchase three additional Walmart gift cards from Ortiz. As Ortiz was processing the transaction, Pena returned to register No. 22 and noticed defendant was using what appeared to be a credit card to purchase the gift cards. Pena informed Ortiz and defendant that, according to store policy, gift cards could only be purchased with a debit card or cash. Defendant handed back the three gift cards and Ortiz voided the second transaction. Defendant was apparently permitted to keep the first gift card purchased through the initial transaction. Shortly thereafter Ortiz told his store manager he had permitted a gift card to be purchased with a credit card because he did not know Walmart had a policy prohibiting it.

Defendant then proceeded to register No. 1 and attempted to purchase another Walmart gift card at that register. Scotty Southwell, a plainclothes loss prevention officer at the Walmart store, testified he was in the loss prevention office when he was notified suspicious transactions were taking place. Southwell was given a description of defendant and determined he was at register No. 1. Southwell went to a bench across from that register and directly observed defendant purchase a Walmart gift card with a red- or orange-colored card.

3

After defendant finished the transaction, Southwell, now accompanied by loss prevention officer Vyron Harris, approached defendant. Southwell identified himself and asked defendant for the receipt and card used to pay for the transaction he had just completed. Defendant handed Southwell a receipt and a red- or orange-colored card. The last four digits of the card did not match the four digits of the card on the receipt.[2] Defendant apologized, claiming he had given Southwell the wrong card, and gave him two gold cards. The last four digits of those cards likewise did not match the numbers on the receipt.

Defendant began walking toward an exit door. Southwell, followed by Harris, asked defendant why the card numbers did not match those on the receipt. Defendant handed Southwell yet another card; the numbers again did not match. Southwell then asked defendant to come to the loss prevention office for further investigation. Defendant kept walking toward the exit. A few feet from the exit door defendant pushed Southwell, dropped some receipts and tried to run. Southwell, Harris and two additional loss prevention officers (the victims of the four robbery counts) attempted to detain defendant, who struggled to break free. After defendant was wrestled to the ground, he moved his left arm toward his waistband, stating he was reaching for a gun. Defendant was forcibly restrained and handcuffed. No gun was found on his person. Recovered from defendant's possession were four payment cards issued by MasterCard and Visa, as well as several gift cards from Walmart and elsewhere.

Much of the incident was recorded on the store's multiple security cameras. The surveillance tapes of defendant's attempted flight and detention, like the tapes of the transactions at the registers, were played for the jury.

---

[2]     The card Williams handed Southwell had a sticker on it. When Southwell peeled back the sticker, it revealed the card was a gift card with a fixed value of $50. The Walmart gift card Williams purchased with it had a value of $200.

Los Angeles County Sheriff's Deputy Erich Doepking, who at the time of trial had two years of experience investigating financial crimes, testified the cards recovered from defendant had been altered so the account number on the face of the cards did not match the account information re-encoded on their magnetic strips.

Defendant testified in his own behalf, admitting he had previously been convicted of nine felonies, including robbery, and one misdemeanor. He contended he had gone to the Walmart store with a friend who had given him two gift cards with a combined value of $300. He claimed he tried to use these cards to purchase several small denomination Walmart gift cards from the cashiers at registers Nos. 5 and 22. Defendant denied going to register No. 1, claiming he had gone to the service manager's area to get approval for the purchase of the gift cards when Southwell approached him.

Defendant testified further that he began walking toward the exit after he had given Southwell all the cards and receipts in his possession, but Southwell kept questioning him. Defendant was nervous in part because he had smoked marijuana and consumed alcohol that morning and had used methamphetamine the day before. Defendant denied intentionally pushing Southwell, contending Southwell had cut him off just as he was trying to open the exit door. Defendant also denied struggling with the loss prevention officers or threatening that he had a concealed gun.

The jury convicted defendant of four counts of second degree robbery, one count of second degree burglary, fraudulent use of an access card or account information, grand theft, and forgery.

## DISCUSSION

As noted, robbery is "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will,

5

accomplished by means of force or fear." (§ 211.) Moreover, "robbery is a continuing offense that begins from the time of the original taking [and does not end] until the robber reaches a place of relative safety." (*Estes, supra,* 147 Cal.App.3d at p. 28.) Larceny, like robbery, has likewise long been deemed a "continuing offense." (*Gomez, supra,* 43 Cal.4th at p. 254.) "All the elements [of either offense] must be satisfied before the crime is completed. However . . . no artificial parsing is required as to the precise moment or order in which the elements are satisfied. This conclusion is consistent with decades of California jurisprudence." (*Ibid.,* fn. omitted.)

These well-established rules plainly apply where the thief grabs the loot from a store employee (a theft by larceny) and then uses force or fear to facilitate his escape with the loot before reaching a place of temporary safety. Theft by larceny "requires the taking of another's property, with the intent to steal and carry it away. [Citation.] 'Taking,' in turn, has two aspects: (1) achieving possession of the property, known as 'caption,' and (2) carrying the property away, or 'asportation.' [Citations.] Although the slightest movement may constitute asportation [citation], the theft continues until the perpetrator has reached a place of temporary safety with the property." (*Gomez*, *supra*, 43 Cal.4th at pp. 254-255, fn. omitted.)

In contrast, theft by trick and theft by false pretenses both involve appropriation of property when consent to its possession is obtained by fraud or deceit. With theft by trick, however, the property owner transfers, and intends to transfer, only possession, whereas with theft by false pretenses, the owner transfers both possession and ownership. (*People v. Ashley* (1954) 42 Cal.2d 246, 258 (*Ashley*) ["[theft by trick] is the appropriation of property, the possession of which was fraudulently acquired; obtaining property by false pretenses is the fraudulent or deceitful acquisition of both title and possession"]; *People v. Traster*

6

(2003) 111 Cal.App.4th 1377, 1387 ["presence or absence of evidence of the fourth element of transferring 'ownership' or 'title' distinguishes the crime of theft by false pretenses from the crime of theft by trick . . ."].)

The question before us is whether those same rules allowing conviction for robbery where the underlying theft is theft by larceny or theft by trick, and where force or fear is utilized at some point *after* the taking in order to facilitate escape with the loot, also apply when the thief unlawfully obtains the property through false pretenses, as when he uses an altered or re-encoded gift or credit card to make a fraudulent store purchase, and then uses force or fear to escape with the stolen goods. The Legislature has told us they do. So has this court, in several of our past decisions.

**a.** *Relevant statutory provisions and underlying legislative intent*

As the majority acknowledges, the crime of theft is comprised of several different common law crimes, including theft by larceny, theft by trick, and theft by false pretenses. (See *People v. Cuellar* (2008) 165 Cal.App.4th 833, 837.) However, in 1927, our Legislature consolidated these common law crimes into a single statutory crime denoted "theft" (§ 484).[3] (See *Gomez*, *supra*, 43 Cal.4th at p. 255, fn. 4; *Cuellar*, at p. 793.) It is true that the common law offenses consolidated in section 484 are each "aimed at different criminal acquisitive techniques" (*Ashley, supra,* 42 Cal.2d at p. 258), and have distinct elements (*ibid.*). Nevertheless, "[t]*he purpose of the consolidation was to remove the technicalities that existed in the pleading and proof of these crimes at common*

---

[3]     Section 484, subdivision (a), provides, in part, "Every person who shall feloniously steal, take, carry, lead, or drive away the personal property of another, or who shall fraudulently appropriate property which has been entrusted to him or her, or who shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money, labor or real or personal property . . . is guilty of theft."

7

*law*. . . . Juries need no longer be concerned with the technical differences between the several types of theft, and can return a general verdict of guilty if they find that an 'unlawful taking' has been proved." (*Ibid.*, italics added; accord, *People v. Counts* (1995) 31 Cal.App.4th 785, 793.) Hence, even where "theft" (§ 484) is itself the charged crime, "a general verdict of guilt may be sustained on evidence establishing any one of the consolidated theft offenses [citations]" (*People v. Curtin* (1994) 22 Cal.App.4th 528, 531), although "the offense shown by the evidence must be one on which the jury was instructed and thus could have reached its verdict" (*ibid.*).

The "taking" element of robbery is not specifically defined or limited in the robbery statute (§ 211), nor has that element ever been explicitly limited to theft by larceny or theft by trick in the case law. (*Ashley*, *supra*, 42 Cal.2d at p. 258.) In the context of the issue before us, whether theft by false pretenses can be transformed through subsequent use of force or fear into a robbery, the Legislature's consolidation of all forms of common law theft into a single statutory crime denoted "theft" (§ 484) — done for the specific purpose of "remov[ing] the technicalities that existed in the pleading and proof of these crimes at common law" (*Ashley,* at p. 258) — itself serves to defeat defendant's hypertechnical claim that a theft committed by false pretenses, even though accompanied by the use of force or fear before the thief has reached a place of temporary safety, can never be transformed into a robbery.

Of even greater significance to the issue before us is the legislative directive found in section 490a. At the same time as the 1927 consolidation of all common law forms of theft into a unified "theft" crime (§ 484 subd. (a)), our Legislature also enacted this provision: "Wherever any law or statute of this state refers to or mentions larceny, embezzlement, or stealing, said law or statute shall

8

. . . be read and interpreted as if the word 'theft' were substituted therefor."
(§ 490a.)

Section 490a indicates the Legislature's intent that the different types of common law theft consolidated in section 484, subdivision (a), are to be treated as the single crime of "theft" in California. The case of *People v. Nguyen* (1995) 40 Cal.App.4th 28 (*Nguyen*), furnishes an example of section 490a's application to the crime of burglary, where the unlawful entry is for the purpose of committing theft. In *Nguyen*, the defendant argued that his intent to commit petty theft by false pretenses was insufficient to support his burglary conviction. (*Id.* at p. 30.) Rejecting that argument, the *Nguyen* court pointed to the Legislature's use of the term "larceny" in the burglary statute (§ 459 ["Every person who enters any . . . building . . . with intent to commit grand or petit *larceny* or any felony is guilty of burglary" [italics added], and went on to find dispositive section 490a's directive to replace "larceny" with the broader term "theft." (*Nguyen*, *supra*, at p. 31.) Upholding the defendant's burglary conviction, the *Nguyen* court explained that the Legislature, by simultaneously amending section 484 (the theft statute) and enacting section 490a, "indicated a clear intent that the term 'larceny' as used in the burglary statute . . . be read to include all thefts, including 'petit' theft by false pretenses." (*Nguyen*, *supra*, at p. 31.)[4]

---

[4]     The majority places reliance on this court's decision in *People v. Myers* (1929) 206 Cal. 480 (*Myers*), decided two years after the consolidated theft statutes (§§ 484; subd. (a); 490a) were enacted by a single piece of legislation (Stats. 1927, ch. 619, pp. 1046-1047), and in which decision we suggested "the essence of section 490a is simply to effect a change in nomenclature without disturbing the substance of any law." (*Myers*, at p. 485; see maj. opn., *ante*, at pp. 15-16.) I would place greater reliance on the later decisions of this court, discussed fully in my dissent, that have gone on to explain in greater detail the full legislative intent and purpose behind the consolidated theft statutes which, together with the robbery statute, control in this case. (See, e.g., *Gomez*, *supra*, 43 Cal.4th at p. 255, fn. 4; *Ashley, supra,* 42 Cal.2d at p. 258.) The intermediate

True, unlike the burglary statute, the robbery statute does not utilize either the term "larceny," or the term "stealing." Rather, it uses the broader phrase "felonious taking of personal property." (§ 211) to denote the taking element of robbery. Section 490a, however, states that any law or statute that "*refers to or mentions* larceny . . . *or stealing*" (italics added) should be read and interpreted as if the word "theft" were substituted. Thus, the statute need not specifically mention larceny or stealing; to simply refer to larceny or stealing is enough. A felonious taking *is* a taking done with the intent to steal another's property (*People v. Tufunga* (1999) 21 Cal.4th 935, 948 (*Tufunga*); 2 Burdick, Law of Crime (1946) § 563, p. 311), which *is* tantamount to the commission of larceny (see Perkins and Boyce, Criminal Law, *supra*, Offenses Against Property, ch. 4, § 2, p. 343 ["Because all larceny was felony at common law, the word 'felonious,' used in connection with the taking of property means a taking with intent to steal. The 'taking' means a taking of possession in this definition [of robbery], as in the definition of larceny." (fn. omitted.)])

In short, the robbery statute *is* a statute that "refers to . . . larceny *or stealing*." (§ 490a, italics added.) That is because the "felonious taking" element of robbery *is* a taking done with the intent to steal another's property "against his will." (§ 211.) Because section 490a directs that any law that "refers to . . . larceny or stealing" is to be read and interpreted as if the term "theft" was inserted therein, and because the robbery statute incorporates such a reference, albeit indirectly, the "felonious taking" element of robbery must be interpreted as

appellate court decision in *Nguyen, supra,* 40 Cal.App.4th 28, further informs the legislative intent behind the unified theft statutes, as it explains how section 490a applies to the felony of burglary where "theft" (§§ 484, subd. (a); 490a) forms the basis for the illegal entry. The rationale of *Nguyen* is applicable, by analogy, to the issue pertaining to the robbery statute here before us. This court denied a petition for review in *Nguyen*. (*Nguyen,* at p. 37.)

10

synonymous with "theft" (§§ 484, subd. (a); 490a). (See *Tufunga, supra,* 21 Cal.4th at pp. 938-939 ["the 'felonious taking' required for robbery under section 211, as well as that for theft under section 484, is a taking accomplished with felonious intent, *that is, the intent to steal*, a state of mind that California courts for over 150 years have recognized as inconsistent with the good faith belief that the specific property taken is one's own." (Italics added.)].) Here, defendant's conduct in *stealing* gift cards from Walmart, although accomplished by false pretenses, plainly satisfied the felonious taking element of robbery.

And there is more. The consolidated theft statute itself goes on to expressly provide, "For the purposes of this section, *any false or fraudulent representation or pretense made shall be treated as continuing, so as to cover any money, property or service received as a result thereof* . . . ." (§ 484, subd. (a), italics added.) This explicit language removes any doubt that the Legislature intended the common law crime of theft by false pretenses — now a form of theft consolidated into the unified statutory offense of "theft" found in section 484, subdivision (a) — to be treated the same as theft by larceny or theft by trick, not only for purposes of pleading and proof, but also with respect to the consequences of using force or fear in connection with its commission. If the fraudulent representation or pretense continues over time so as to cover all fruits of the crime, whenever received, there is no reason, in law or logic, to interpret the taking element of the robbery statute any differently for purposes of proving an "*Estes* robbery" (*Estes, supra,* 147 Cal.App.3d at p. 28), where the underlying theft is theft by false pretenses, and the thief uses force or fear to facilitate his escape with the loot moments after taking possession of it. The Legislature could not have intended otherwise.

The majority's analysis of the 18th century English common law roots of the various common law forms of theft (maj. opn., *ante*, at pp. 4-10), going back

11

as far as certain of the English Parliament's statutory enactments in the year 1275 (*id.* at p. 6), in support of its conclusion that the common law crime of theft by false pretenses is not a continuing form of theft, and cannot be transformed into robbery where force or fear is later used, overlooks the important remedial legislation that consolidated the common law forms of theft into the unified crime of "theft" in California. (§§ 484, subd. (a), 490a.) The robbery statute, together with the legislative intent behind the consolidated theft statutes (*ibid.*), are what directly control in this case. (Cf. *Tufunga, supra*, 21 Cal.4th at pp. 938-939 [Because the Legislature incorporated the "claim of right" defense into the robbery statute when robbery was first codified in 1872, such clear legislative intent controls notwithstanding public policy considerations disfavoring the forcible recapture of property].)

### b. *Relevant California decisions*

Justice Perluss, writing for a unanimous Court of Appeal below, reasoned that defendant's claim — that his robbery convictions must be reversed because theft by false pretenses lacks the elements of a trespassory taking and asportation, and is completed, in the context of a fraudulent store purchase, when the defrauded merchant passes possession and title to the thief at the cash register — "unduly focuses on the 'acquisitive technique' underlying the theft (*Ashley*, *supra*, 42 Cal.2d at p. 258)[,] that is, the consensual delivery of possession *and* ownership of the property based on false pretenses[,] rather than [on] the ' "central element of the crime of robbery" '[, to wit,] that ' "force or fear [is] applied to the individual victim in order to deprive him of his property." ' (*Gomez, supra*, 43 Cal.4th at p. 265.)" (Fn. omitted.) I agree with the Court of Appeal's reasoning in this respect. A number of decisions of this court are in accord.

Many decisions since *Estes, supra,* 147 Cal.App.3d 23, have reaffirmed that court's conclusion that theft (§§ 484, subd. (a); 490a) becomes robbery even

12

when possession of property is peacefully or fraudulently obtained if force or fear is thereafter used to either carry it away or retain it.  (See, e.g., *Anderson*, *supra*, 51 Cal.4th. at p. 994 [citing *Estes*]; *Gomez*, *supra*, 43 Cal.4th at pp. 258-261 [discussing *Estes* in holding robbery victim need not be present when defendant initially takes money; "California has described robbery as a continuing offense for decades"]; *People v. Hill* (1998) 17 Cal.4th 800, 850 (*Hill*) [" '[E]ven if the perpetrator used peaceful means, such as a pretext, to separate the property from the victim, "what would have been a mere theft is transformed into robbery if the perpetrator . . . [later] uses force to retain or escape with [the property]." ' "]; *People v. Webster* (1991) 54 Cal.3d 411, 441 [same]; *People v. Cooper* (1991) 53 Cal.3d 1158, 1165, fn. 8 [citing *Estes* with approval; "mere theft becomes robbery if the perpetrator, having gained possession of the property without use of force or fear, resorts to force or fear while carrying away the loot"].)

It is true, as defendant observes, that this court's past decisions touching on that proposition have somewhat inconsistently referred to robbery both as an aggravated form of *larceny* (see, e.g., *Anderson, supra,* 51 Cal.4th at p. 994; *Gomez, supra,* 43 Cal.4th at p. 254) and an aggravated form of the broader term *theft* (see, e.g., *People* v. *Ortega* (1998) 19 Cal.4th 686, 699 ["Theft in whatever form it happens to occur is a necessarily included offense of robbery."]; *People* v. *Bradford* (1997) 14 Cal.4th 1005, 1055 [" 'Theft is a lesser included offense of robbery, which includes the additional element of force or fear,' " quoting *People* v. *Melton* (1988) 44 Cal.3d 713, 746].)

However, it is also true, as noted by the Court of Appeal, that this court's prior references to robbery as a form of aggravated *larceny* simply reflect the reality that most robberies are accomplished by means of a larceny.  Because the victim of a theft by false pretenses intends to convey possession and title of the property to the thief, there is necessarily no victim resistance at the time the

13

property is acquired, and consequently, no occasion to use force to overcome any resistance. The situation, however, can change in the less typical circumstance where the victim discovers the false pretenses while the perpetrator is still in his or her presence. If the victim seeks to reclaim the property upon discovery of the false pretenses, any use of force or fear by the thief in an effort to retain the stolen property transforms the theft into a robbery. (*Hill, supra,* 17 Cal.4th at p. 850.) It may also be observed that, until today, none of this court's decisions characterizing robbery as an aggravated form of *larceny* have expressly held that an "*Estes* robbery" can only be predicated on theft by larceny or theft by trick, as opposed to theft by false pretenses.

I further agree with the Court of Appeal that, with regard to relevant public policy considerations, there is simply no public policy justification for treating theft by false pretenses differently from theft by larceny or theft by trick when the defendant uses force or fear after the property owner, who technically consents to deliver ownership (i.e., title) of the goods, immediately recognizes he or she is a victim of a scam and tries to reclaim the property. Regardless of the victim's fraudulently induced intent in transferring the property, the key factors for establishing robbery are the defendant's intent "to deprive the victim of the property permanently" (*Anderson, supra,* 51 Cal.4th at p. 994), the defendant's greater culpability resulting from the application of force or fear, and the need to deter more dangerous conduct. (*Gomez, supra,* 43 Cal.4th at p. 264.) Both were met in this case.

The majority reasons that theft by larceny requires a trespassory taking, which is a taking without the property owner's consent, whereas "theft by false pretenses involves the *consensual* transfer of possession as well as *title* of property; therefore, it cannot be committed by trespass." (Maj. opn., *ante*, at p. 14.) From this premise, the majority goes on to conclude that "[b]ecause a

14

'felonious taking,' as required in California's robbery statute (§ 211) must be *without the consent* of the property owner, or 'against his will' (*ibid*.), and Walmart *consented* to the sale of the gift cards, defendant did not commit a *trespassory* (nonconsensual) taking, and hence did not commit robbery." (Maj. opn., *ante*, at p. 15.)

With regard to the robbery statute's further requirement of *asportation* of the stolen goods, the majority then reasons that because theft by false pretenses lacks the elements of a trespassory taking, "[t]he crime of theft by false pretenses ends at the moment title to the property is acquired" (maj. opn., *ante*, at p. 13), which, here, would be the moment at which the defrauded cashiers handed defendant the fraudulently purchased (i.e., stolen) Walmart gift cards. Although defendant then walked several feet toward the store exit after being questioned by the loss prevention officers — in a plain attempt to carry off or "asport" the stolen loot in the presence of the investigating officers — not so says the majority. The theft crime ended several feet back at the cash register, they reason, and hence there could be no "asportation" for purposes of robbery.

The majority's legal reasoning is flawed. The robbery statute does not expressly require that the taking be "without the consent of the property owner." (Maj. opn., *ante*, at p. 15, italics omitted.) It expressly requires that the taking be "against his will." (§ 211.) This court has held that "[t]he act of taking personal property from the possession of another is always a trespass unless the owner consents to the taking *freely and unconditionally* . . . ." (*People v. Davis* (1998) 19 Cal.4th 301, 305 (*Davis*), italics added, fns. omitted.)[5] As we explained in *Gomez*, *supra*, 43 Cal.4th 249, " 'When the perpetrator and victim remain in close

---

[5] "This is not traditional trespass onto real property, of course, but trespass *de bonis asportatis* or trespass 'for goods carried away.' (Perkins [& Boyce, Criminal Law[, *supra*], at p. 304.)" (*Davis*, *supra*, 19 Cal.4th at p. 305, fn. 2.)

15

proximity, a reasonable assumption is that, if not prevented from doing so, the victim will attempt to reclaim his or her property.' " (*Id.* at p. 264.) As these decisions explain, in the context of robbery, including an *Estes* robbery, a "theft" (§§ 484, subd. (a), 490a) committed through false pretenses *is* a taking "against [the property owner's] will." (§ 211.)

The majority's further reliance on *People v. Beaver* (2010) 186 Cal.App.4th 107 is misplaced, as that decision is entirely inapposite to the facts giving rise to the issue concerning *the robbery statute* directly before us. As the majority observes, in *Beaver* "the defendant staged an accident at his place of employment, a ski resort, to obtain medical expenses for a preexisting injury to his knee. The defendant was convicted of grand theft. The Court of Appeal reversed the conviction, holding that the jury was instructed on the incorrect type of theft — theft by larceny — and instead should have been instructed on theft by false pretenses. [The] *Beaver* [court] said: 'The present matter did not involve a taking of property from another without his consent. [The ski resort] willingly paid for defendant's medical treatment on the false representation that [it] had caused defendant's injuries. This was theft by false pretenses, not larceny.' (*Id.* at p. 121.)" (Maj. opn., *ante,* at p. 14.)

*Beaver* was not a robbery case; the charge was grand theft.[6] In *Beaver*, the fraudulently staged accident at the ski resort was complete well before the defrauded employer actually paid out medical expenses for the defendant's "preexisting injury to his knee." There is simply no meaningful comparison to be made between the situation faced by the employer in *Beaver* as a result of the

---

[6] Defendant was likewise convicted of grand theft, as well as second degree burglary, forgery, the unlawful use of an access card or account information, a felony, and the four robbery counts. On appeal, however, he challenged only his robbery convictions.

16

fraudulently staged accident, which led to the payout of medical expenses at some point well after the completed theft by false pretenses, and the situation faced by Walmart and its security guards here, who directly observed defendant's fraudulent transaction at register No. 1, who were in the process of questioning and then pursuing him as he walked from the cash register and headed toward the exit with the stolen loot, and who then became the victims of his use of force and fear as they were attempting to apprehend him, for what ultimately proved to be the commission of five distinct felonies.

Under the particular facts of this case, it cannot in reason be said that Walmart and its employees consented to the taking of the fraudulently procured gift cards "freely and unconditionally." (*Davis, supra,* 19 Cal.4th at p. 305.) By the time of defendant's third fraudulent purchase at register No. 1, he had already been told that sales of gift cards purchased with other gift or credit cards was against store policy. He had been asked to, and had returned, the three gift cards handed to him during the voided transaction at register No. 22, but was still in possession of the first gift card he had fraudulently "purchased" during the initial transaction at that cash register. He was under suspicion of attempting fraudulent purchases by the time he walked over to register No. 1 to attempt the ploy yet a third time. Security personnel had been alerted, and loss prevention officer Southwell had proceeded to the area of the register and directly observed defendant making the final fraudulent purchase of a Walmart gift card with a red- or orange-colored card. At some point moments thereafter Southwell interceded, questioning defendant as he left the register and requesting the credit or gift card he had just used to make the purchase, and the receipt. Additional security guards arrived to assist Southwell as defendant began walking toward the store exit with the fraudulently purchased (i.e., stolen) Walmart gift cards in his possession.

17

What matters in this case is not whether defendant's theft crime was theft by larceny or theft by false pretenses under the common law. What matters is whether his conduct established the requisite elements of *robbery*. " '[E]ven if the perpetrator used peaceful means, *such as a pretext*, to separate the property from the victim, "what would have been a mere theft is transformed into robbery if the perpetrator . . . [later] uses force to retain or escape with [the property]." ' " (*People v. Webster* (1991) 54 Cal.3d 411, 441.)" (*Hill, supra,* 17 Ca1.4th at p. 850, italics added.) Although theft by false pretenses, when considered as a separate common law crime, does not require a trespassory taking or asportation of the stolen property, it may, on facts such as these, be transformed into robbery through the use of force or fear.

Here, it matters not that the common law crime of theft by false pretenses would have been "complete" at the moment defendant walked from the cash register. The evidence plainly established that he did, from that point on, carry away or "asport" the stolen property, and that he then used force and fear against four security officers to facilitate his escape with the loot before reaching a place of temporary safety. As such, all of the elements of robbery were established. (*Gomez, supra,* 43 Cal.4th at pp. *255-260; Hill, supra,* 17 Cal.4th at p. 850.) Any other result would be contrary to the important public policies behind our robbery and unified theft statutes. **7**

---

**7**     This case directly involves a theft by false pretenses through use of an altered or re-encoded gift or credit card to make a fraudulent purchase from a retail business establishment. But were a thief to instead knowingly use a stolen credit card, a forged check, or even his own check, knowing there were insufficient funds to cover it, in order to make such a fraudulent purchase from a store, or were he to use any such fraudulent document to induce a teller of a bank or check cashing service to relinquish possession and title to a quantity of cash, the majority's holding — that any "theft by false pretenses cannot satisfy the 'felonious taking' element of robbery (maj. opn., *ante*, at p. 16) —would presumably apply.

18

**CONCLUSION**

I would affirm the judgment of the Court of Appeal.

**BAXTER, J.**

---

Indeed, if, during any of these fraudulent transaction scenarios, the thief for whatever reason were to pull out a gun and shoot and kill one or more persons while fleeing with the loot, under the majority's holding, there would be no robbery as a matter of law, and hence, no charge of felony murder robbery would lie. The majority expressly concedes as much. (Maj. opn., *ante*, at p. 15, fn. 5.) Although our decision in *Hill, supra,* 17 Cal.4th at page 800, a capital murder appeal with many issues, merely discussed the point in a single paragraph (*id.* at p. 850), the plain implication of our holding in *Hill* is that theft by false pretenses may be transformed into robbery through the use of fear or force, and that where a victim is killed, the crime becomes felony murder robbery.

Given the important societal interests served by the robbery statute — that of protecting " 'the *safety and security of the person* [robbed] as well as the social interest in the protection of property rights.' " (*Gomez, supra,* 43 Cal.4th at p. 264, italics added) — I find the outcome in this case particularly troubling.

19

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Williams

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 197 Cal.App.4th 339
**Rehearing Granted**

_____

**Opinion No.** S195187
**Date Filed:** August 26, 2013

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Bernie C. LaForteza

_____

**Counsel:**

Tracy A. Rogers, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka and Lance E. Winters, Assistant Attorneys General, Scott A. Tayrle, Lawrence M. Daniels and Michael C. Keller, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Tracy A. Rogers
3525 De. Mar Heights Rd. #193
San Diego, CA 92130
(858) 342-0441

Michael C. Keller
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 897-2258